In the Matter of Harry M., Appellant. Wassaic Developmental Center, Respondent.

Second Department, October 31, 1983

APPEARANCES OF COUNSEL

*Francis M. Savastano, Robert A. Feenick* and *William M. Brooks* for appellant.

*Robert Abrams,* Attorney-General (*Thomas P. Dorsey* of counsel), for respondent.

TITONE, J. P.

■ In this proceeding brought pursuant to section 15.35 of the Mental Hygiene Law, the petitioner appeals from an order of the Supreme Court, Dutchess County, which certified a jury verdict finding that he is mentally retarded and in need of further retention at the Wassaic Developmental Center for a period not to exceed one year measured from the initial order of retention dated September 9, 1982.[*] His primary contention is that the court's instructions to the jury denied him due process of law because they created a possibility that the jury would find him to be in need of further retention merely because treatment would be beneficial to him even if he posed no threat of harm to himself or others. We agree that the instructions were erroneous and reverse.

The salient facts are not in dispute. In 1941, petitioner, then eight years of age, was admitted to the Wassaic Developmental Center, a school for the mentally retarded. He remained at Wassaic for the next 32 years until his discharge in 1973. Apparently, he functioned well for several years thereafter, but began to suffer seizures and psychotic episodes of paranoia in 1980 and voluntarily returned to Wassaic for some brief treatment. The next year, following an arrest for breaking some furniture at his motel residence, he was admitted to the Harlem Valley Psychiatric Hospital with a diagnosis of chronic paranoid schizophrenia. He was discharged little more than two months later and returned to his own apartment while receiving outpatient treatment.

In January, 1983, petitioner's social worker, Richard Sprance, and a psychologist went to investigate complaints of loud noises emanating from his apartment. Sprance could not obtain petitioner's consent for entry and persuaded the landlord to open the door with his key. Sprance noticed some broken furniture and tried to induce peti-

---

[*] "Since the controversy here is one likely to recur and may in the future again evade review, the issues presented are plainly not moot (see *United States v New York Tel. Co.,* 434 US 159, 165, n 6, quoting *Southern Pacific Term. Co. v ICC,* 219 US 489, 515; see, also, *Roe v Wade,* 410 US 113, 125; *East Meadow Community Concerts Assn. v Board of Educ.,* 18 NY2d 129, 135)" (*Matter of Eichner [Fox],* 73 AD2d 431, 435, mod on other grounds *sub nom. Matter of Eichner v Dillon,* 52 NY2d 363).

tioner to see a physician. They continued to talk for about 45 minutes when petitioner picked up a knife and made a threatening motion towards his two uninvited guests.

Sprance wanted to get petitioner out of the apartment and under immediate supervisory conditions. Believing that petitioner was not a candidate for civil commitment because his I.Q. exceeded 70, Sprance decided that his best course would be to press a criminal charge of menacing, a class B misdemeanor (Penal Law, § 120.15).

Following arraignment on the information, petitioner was found incompetent to stand trial and was readmitted to Wassaic for a period not to exceed 90 days, as specified by CPL 730.40 (subd 1). When that period expired, on April 22, 1982, the State was obligated either to release him or commence civil commitment proceedings (CPL 730.40, subd 2; Pitler, NY Crim Prac Under the CPL, § 7.15, p 349, 1979 Cum Supp, p 161). It was determined to proceed under article 15 of the Mental Hygiene Law which provides for the involuntary admission of a person to a school for the mentally retarded when that person "would benefit from care and treatment as a resident in a school" and such care and treatment "is essential to his welfare, and * * * his judgment is so impaired that he is unable to understand the need for such care and treatment" (Mental Hygiene Law, § 15.01).

When the 90-day period authorized by CPL 730.40 (subd 1) expired on April 22, 1982, petitioner was retained at Wassaic on medical certificates (Mental Hygiene Law, § 15.27) and, upon his refusal to remain as a voluntary patient, application was made for an order of retention (Mental Hygiene Law, § 15.33) which was granted on September 9, 1982 by the County Court of Dutchess County. Petitioner thereupon demanded a jury trial in accordance with section 15.35 of the Mental Hygiene Law.

The evidence at trial tended to establish that petitioner, who by then was under new medication, was now functioning within the limits of mild retardation. Psychiatrists conceded that he was well groomed, a good worker and was neither violent nor destructive. Nevertheless, several witnesses believed that a supervised living arrangement was necessary to ensure that petitioner took his medication and

to provide him with a structured life-style. There is no indication as to what behavioral developments would ensue if he refrained from taking that medication.

Defense counsel, believing that the jury could be misled into directing retention merely upon a finding that institutionalization would be beneficial to his client, requested that the court charge the jury in the following language:

"[I]f you have not found that the state has established by evidence that is clear and convincing that because of his mental retardation Harry M * * * poses a real and present threat of substantial, physical harm to himself or others, you must order the State to discharge Mr. M * * *. Such a threat can result from an inability of Mr. M * * * to meet his food, clothing or shelter needs or an inability to behave in a manner that is either [sic, neither] violent or [sic, nor] otherwise dangerous. Moreover, the State may retain Harry M * * * only if it establishes that Wassaic Developmental Center is the least restrictive setting in which Harry M * * * can live and receive treatment * * *

"You may ask what may happen to Mr. M * * * if the State is ordered to discharge him. If you order to discharge Harry M * * *, he will be released pursuant to a discharge plan drawn up by the Wassaic Development Center. In this would be drawn living accommodations for Mr. M * * *. In addition, as a discharged client, Mr. M * * * must still receive services to assist him in overcoming any psychiatric mental disability that Mr. M * * * may suffer from. In [sum] by ordering the State to discharge Harry M * * *, you are not subjecting him to a life on his own, but a life in the community which he will be assisted by the community services of the Wassaic Developmental [Center]".

Instead of giving these requested charges, the court gave the following charge which tracks the exact language of article 15 of the Mental Hygiene Law:

"Now, ladies and gentlemen, in this case the burden of proof rests upon the State of New York to show by clear and convincing evidence, that Harry M * * * is a person afflicted with mental retardation to such an extent that he is in need of involuntary care and treatment in a school for the retarded. The credible evidence means the testimony and Exhibits that you find worthy to be believed. The law

requires that in order for the State to prevail, the evidence that supports its claim must appear to you to be clear and convincing. In this connection I suggest you ask yourselves; one, is it clear? And, two, is it convincing? If the evidence supporting the statements claimed does not appear to you as being clear and convincing, then you must resolve the question in favor of Harry M * * * It is only if the evidence supporting the statements claimed appears to you as being clear and convincing that you can find in favor of the State * * *

"Ladies and gentlemen, I further charge you that mental retardation means sub-average intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior.

"The [term 'care and treatment'] means furnishing to such mentally retarded person medical care, surgical attendance, nursing and medications as well as food, clothing and maintenance. The term 'in need of involuntary care and treatment' means that a person is in need of in-patient care and treatment as a resident in a school, that such care and treatment is essential to his welfare, and that his judgment is so impaired that he is unable to understand the need for such care and treatment".

The jury was sent out to deliberate and answer the following interrogatory: "Is the alleged retarded person afflicted with mental retardation to such an extent that he is in need of involuntary care and treatment in a school for the retarded?" The unanimous jury response was "yes".

On appeal, petitioner does not challenge the weight of the evidence or the constitutionality of the procedure set forth in article 15 of the Mental Hygiene Law in and of themselves. Rather, he focuses on the jury instructions, claiming that the standard they enunciated was too broad and therefore unconstitutional. The Attorney-General, on the other hand, urges that the instructions given were proper because they followed the statutory language itself and the State, under the doctrine of *parens patriae,* may direct involuntary retention of mentally retarded persons requiring care and treatment. Mindful of the presumption that the Legislature intended to enact a constitutional statute (*People v Epton,* 19 NY2d 496, 505; *People v Finkel-*

*stein,* 9 NY2d 342, 344) and of our obligation to construe a statute in a fashion that not only upholds its constitutionality " 'but also * * * avoid[s] any grave doubts upon that score' " when it is feasible to do so (*Matter of Coates,* 9 NY2d 242, 253, app dsmd *sub nom. Coates v Walters,* 368 US 34; see, also, *People v Nieves,* 36 NY2d 396, 400), we reject the Attorney-General's position and hold the instructions inadequate.

Recognizing the "massive curtailment of liberty" brought about by involuntary civil commitments (*Humphrey v Cady,* 405 US 504, 509), courts and legislatures have long struggled with the competing policy considerations of individual freedom and the State's right to protect mental incompetents from themselves and others (see, e.g., Morse, A Preference for Liberty: The Case Against Involuntary Commitment of the Mentally Disordered, 70 Cal L Rev 54; Note, Civil Commitment of the Mentally Ill: Theories and Procedures, 79 Harv L Rev 1288). As the United States Court of Appeals for the Ninth Circuit has observed, "protecting the constitutional rights of the mentally retarded has become a concern of national importance, and * * * the courts, when appropriate, can exercise their powers to protect those rights" (*United States v Mattson,* 600 F2d 1295, 1297; see, also, *Tyars v Finner,* 709 F2d 1274, 1283; Ennis and Emery, The Rights of Mental Patients).

While the law is somewhat in a state of flux, we believe it to be well established that if an individual can live safely in freedom and is not dangerous to himself or others, due process will not tolerate his involuntary commitment irrespective of whether treatment some may deem beneficial will be provided (*O'Connor v Donaldson,* 422 US 563, 576; *Project Release v Prevost,* 551 F Supp 1298, 1304; *Matter of Scopes,* 59 AD2d 203, 205; see dissent of BRENNAN, J., in *Jones v United States,* 463 US __, __, 103 S Ct 3043, 3053). Moreover, the danger must be a substantial threat to his physical well-being to justify commitment (*State v Krol,* 68 NJ 236, 260-261; *Matter of Harris,* 98 Wn 2d 276, 282-283; *Hatcher v Wachtel,* 269 SE2d 849, 852 [W Va]). Even then, only the least restrictive alternative consistent with the legitimate purposes of such a commitment may be imposed (*Matter of Kesselbrenner v Anonymous,* 33 NY2d 161; *Project Release v Prevost,* 551 F Supp 1298, 1304, *supra*).

True, the exercise of the State's *parens patriae* power is still recognized as a legitimate basis for the involuntary confinement of persons suffering from serious mental disorders (*Addington v Texas,* 441 US 418, 426). Absent an overriding State interest, however, a patient has the basic right to control the course of his own treatment, even though such treatment may be necessary to preserve his life (*Matter of Storar,* 52 NY2d 363, 376-377; see *Doe v Doe,* 377 Mass 272; *Matter of Sonsteng,* 175 Mont 307). "Society abounds with persons who should be hospitalized, either for gallbladder surgery, back operations, corrective orthopedic surgery, or other reasons; yet, in these areas society would not contemplate involuntary hospitalization for treatment." (*State ex rel. Hawks v Lazaro,* 157 W Va 417, 437.)

For the same reasons, a State may not act as a guardian of a person who suffers from a mental defect unless that person is incapable of evaluating his own needs for psychiatric care and treatment (cf. *Matter of Ballay,* 482 F2d 648, 658-659; *Matter of Sonsteng, supra; Matter of Hatley,* 291 NC 693). "[I]t is possible for many non-violent persons who suffer from a mental disease or retardation to live outside of an institution, and when they prefer to do so, regardless of the wisdom of their decision or the strength of their reasoning powers, they have their constitutional right to follow their own desires." (*Kendall v True,* 391 F Supp 413, 418.)

Article 15 of the Mental Hygiene Law, though lacking some clarity, does not authorize the involuntary commitment of mentally retarded persons solely for the purpose of providing treatment. In our view, an individual who cannot survive safely without the care and assistance provided in an institutionalized setting such as in a school like Wassaic (see Mental Hygiene Law, § 1.03, subd 11), poses a clear danger to himself (see *O'Connor v Donaldson,* 422 US 563, 574, n 9, *supra*). The statutory scheme requires that the care and treatment be "essential" to the person's welfare (Mental Hygiene Law, § 15.01), that alternative forms of care and treatment be considered (Mental Hygiene Law, § 15.27) and that it be established that the person's judgment is so impaired that he is unable to understand the

need for such care and treatment (Mental Hygiene Law, § 15.01). These criteria permit the continued confinement of those individuals whose mental condition manifests itself in a neglect or refusal to care for themselves which presents a real threat of substantial harm to their well-being (see *State ex rel. Hawks v Lazaro,* 157 W Va 417, 438, *supra; Commonwealth v Nassar,* 380 Mass 908).

Nevertheless, it is basic that while a court may generally charge in the statutory language, "it should not do so where the exact statutory language might mislead the jury" and "not every instruction can be considered free from error merely because it is in the language of a statute" (88 CJS, Trial, § 337, pp 886, 882; see, e.g., *Nelson v Underwood,* 244 Ark 1065, 1067; *Summers v Weyer,* 141 Ind App 176, 179; cf. *Bacon v Celeste,* 30 AD2d 324; 326; *People v Summer,* 64 AD2d 658, 659). Upon examination of the charge in its entirety, we believe that it may have conveyed the impermissible impression that petitioner could be legitimately confined solely for the purpose of treatment (*Matter of Scopes,* 59 AD2d 203, *supra*).

This is not to say that the jury should have been instructed in the precise fashion requested by petitioner's counsel. Indeed, we find that some of the language requested might tend to obfuscate issues. All we hold is that a charge must include a directive to the effect that a patient may not be retained involuntarily unless the State establishes, by clear and convincing evidence, that he poses a substantial threat of physical harm to himself or others, and that such a threat can result from a failure to meet his essential need for food, clothing or shelter.

One other issue deserves brief comment. Petitioner also contends that the trial court erred in permitting his entire institutional file to be received into evidence as a business record (CPLR 4518). We agree.

While the recorded conclusions of physicians and others attending to petitioner's needs at Wassaic would be admissible where they were germane to treatment (*People v Kohlmeyer,* 284 NY 366, 369) and could be utilized by in-court experts as the basis of their opinions (*People v Stone,* 35 NY2d 69, 73-75), many of the entries included statements and remarks made by third parties who were not

under a business duty to report to the entrant or were not otherwise admissible under an independent exception to the hearsay rule. Consequently, such portions should have been excluded for failure to meet the requisites of *Matter of Leon RR* (48 NY2d 117) and *Murray v Donlan* (77 AD2d 337). We trust that this will be done at the new trial we are now granting.

For the reasons stated, the order appealed from should be reversed and a new trial granted.

LAZER, MANGANO and GIBBONS, JJ., concur.

Order reversed, without costs or disbursements, and new trial granted.