OPINION OF THE COURT
Robert D. Lippmann, J.
Joyce Brown, also known as Billie Boggs, petitions this court pursuant to Mental Hygiene Law § 9.39 to be released from involuntary confinement in Bellevue Hospital. The city seeks her retention.
The sole issue to be resolved here is whether Joyce Brown has a mental illness which is likely to result in serious harm to herself or others.
The following are the facts adduced from testimony and documentary evidence presented at a hearing held November 2, 4 and 5, 1987 at Bellevue Hospital. Joyce Brown lives on the streets. She has staked out a sidewalk area on Second Avenue between 65th and 66th Streets as her home. With money she gets from panhandling she buys one meal everyday at a neighborhood store. This meal, the same daily, is comprised of a chicken cutlet, juice, milk and ice cream. She keeps warm by lying next to an air vent that releases hot air 24 hours a day. The street is her bedroom, her toilet, her living room.
Her life was not always so. Joyce Brown comes from a middle-class home in New Jersey and worked as a secretary for over 10 years. However, in 1985 her sister found it necessary to take her to the East Orange General Hospital where she was placed in four-point restraint and administered a massive dosage of Thorazine. Upon her release 15 days later on July 11, 1985, the discharge summary described her as "not psychotic” and "not dangerous”. Sometime thereafter she came to New York.
In December 1986 the psychiatric social worker and coordinator of the Homeless Emergency Liaison Project, known as Project HELP, at Gouverneur Hospital began receiving information regarding a nameless woman who was seen crouched or sitting on the street, barefoot, dressed inadequately for the weather, destroying money and refusing all services. From then on members of the outreach group began to see and observe her almost daily. She was seen urinating and defecating on the street and chasing people, particularly Black males.
Medical records from Metropolitan Hospital show Joyce *1084 Brown was brought by the police to its emergency room in February, April, May and September 1987. She was discharged each time as not dangerous.
On October 28, 1987 members of Project HELP forcibly removed her from the street and admitted her to Bellevue’s psychiatric unit where she was medicated with Haldol and Adavan, and where she is now involuntarily confined. She has been examined for her mental condition by at least five psychiatrists affiliated with the hospital or appearing on its behalf. Four of the doctors testified as qualified experts in psychiatry and will be referred to hereinafter as the hospital psychiatrists. Ms. Brown’s legal representative, the New York Civil Liberties Union, had her examined by three psychiatrists, all of whom testified as qualified experts in psychiatry. They will be referred to hereinafter as the NYCLU psychiatrists. The professional credentials and breadth of experience of all the doctors testifying are beyond question.
The diagnosis of the hospital psychiatrists is that Joyce Brown suffers from schizophrenia, paranoid type. They state she is delusional and suicidal, incapable of insight and incompetent to make decisions. Dr. Maeve Mahon, her treating physician, described her insight as "nil”. In the judgment of the hospital psychiatrists she is incapable of caring for herself and should not be allowed to return to the street where her condition would deteriorate within days. They recommend continued hospitalization.
With slight variations, they cited the following as a basis for their conclusion. Joyce Brown ran into oncoming traffic and said she had a right to do this if she so wished. All hospital psychiatrists cited this behavior as suicidal or pathological.
She tore up or burned paper currency but not coins. It appears Ms. Brown offered at least two versions to the hospital doctors to explain this behavior. One hospital psychiatrist testified she perceived those who offered her money as people trying to exercise control over her. Burning the offered money was her way to dispel the control. In the other version, she saw the offerers as Black males, whether they were or not, who wanted to buy sex. The destruction of the currency was her attempt to purge herself of the taint of prostitution and elicit respect. This behavior, say the hospital psychiatrists, is delusional. Also, when asked why she urinated and defecated on herself, she responded with a totally irrelevant account of events in Connecticut. The hospital psychiatrists find this nonassociation of thought delusional thinking.
*1085 One hospital psychiatrist found she engaged in "clanging”, a talking pattern in which the speaker switches from thought to thought based on the sound and rhyme of words. Dr. Mahon found her speech "pressured”, allowing for no interjections of questions or comments.
All cited her hostility, aggressiveness and abusive, obscene language as part of the basis for their diagnosis. One hospital psychiatrist, who had observed her on the street, testified she had on one occasion hurled at him a lunch he had offered her. These doctors fear her hostility may provoke others to cause her harm. None of the hospital doctors found any suicidal or homicidal ideation.
The diagnosis of the NYCLU psychiatrists is nearly at complete variance with that of the hospital psychiatrists. All base their diagnosis on an initial examination lasting about IV2 hours, which included a mental status test, and interviews ranging from 15 to 25 minutes held on subsequent days. Dr. Powel examined her initially on October 30, Drs. Gould and Patel first examined her on November 1.
Dr. Gould discerned no delusional or psychotic behavior. He found her coherent, logical, not tangential. He found her memory for recent and remote events good, her mood and affect appropriate, her abstract thinking good. He says she knows right from wrong. He saw no suicidal or homicidal ideation. He did find her judgment and insight "slightly impaired”.
As to her destruction of money, Dr. Gould explained that if the money was thrown at her insultingly she responded in 1 of 2 ways: she either threw it back or destroyed it. It is her way of retaliating against the insult. Dr. Gould did not find this an irrational reaction.
Regarding her objectionable toilet habits, Dr. Gould said she had no choice but to use the street since she was not allowed to enter the restroom of the neighborhood restaurant. To quote him, "It’s not nice but it’s not delusional.”
As to her running into traffic, the doctor pointed out that among New Yorkers jaywalking is common. More significantly, he emphasized that Ms. Brown had never been hurt, which indicates to him that she has strong survival instincts.
Regarding her refusal of food, the doctor saw this as an appropriate reaction by someone who does not want what is offered and moreover regards the donor as invading her territory.
*1086 Dr. Michael Powel, who hospitalizes hundreds of patients under Mental Hygiene Law § 9.37, found Joyce Brown has limited social judgment but that she is otherwise normal, "warm” and coherent. According to him, her "clang” speech pattern is irrelevant to whether she is likely to harm herself.
Dr. Ramon Patel’s assessment is that Ms. Brown is not psychotic, not delusional, not dangerous to herself or to others. He finds her judgment and insight good. He acknowledged she lied to him regarding her claimed 15-year relationship with a man and about living on the street for 5 years rather than 1 year. His assessment is that she knows what she’s doing and she chose to lie. Since she knew she was lying, she was not delusional.
When asked to predict whether Ms. Brown is likely to harm herself or others, all NYCLU psychiatrists answered in the negative. Dr. Gould, however, conceded that psychiatry is an uncertain science that yields no predictions of future behavior with certainty.
In short, the psychiatric experts do not agree. In fact, the doctors are nearly diametrically opposed in their assessment of Joyce Brown’s mental condition and in their predictions as to whether she is likely to cause herself or others harm. Thus I derive little psychiatric guidance from them and therefore place great weight on the demeanor, behavior and testimony of Joyce Brown herself.
On the stand she provided her own explanation of the street conduct upon which the hospital psychiatrists relied for their diagnosis of her. She explained she used an alias because she wanted to elude her sisters, who, she knew, were looking for her and who in 1985 had had her hospitalized in a psychiatric unit.
She survives on the street by panhandling. She generally collects $8 to $10 a day, although she needs no more than $7 for a meal. She prefers to have no money on her person at night because it’s dangerous. Asked about the destruction of money, she replied that whether she destroys it or not "depends on the manner in which it’s given to me.” If after repeated refusals, the offerer persists and finally throws it or tosses it at her, she destroys it. Ms. Brown quoted the donors in a mocking voice: "It will make me feel good” or "I’m only trying to help you.” Her reaction: "Is it my job to make them feel good?”
With respect to her toilet habits, Ms. Brown explained, "I *1087 don’t have access to toilet facilities.” There being no public toilets except at Grand Central and Pennsylvania Stations, both of which are too distant from her post, she urinates and defecates on the street, though, she insists, never on herself, while covering herself with a coat. Photographs taken by a passerby offered into evidence confirm she covers herself.
Asked on cross-examination about her nonresponsive Connecticut story, Ms. Brown said she remembers nothing about this but explained that she had then been under the influence of drugs administered to her upon her admission to the -hospital.
She often saw the members of Project HELP looking at her and she learned to recognize them. They or the police had several times taken her in handcuffs to Metropolitan Hospital. She resented their presence, their help, their conversation, their offer of food and clothes. Their persistent, often rejected assistance and their "bad” manner of treating her and speaking to her aroused her anger and prompted her abusive, obscene language. One day she threw the pants they gave her into the street. This is the occasion referred to by the hospital psychiatrists when they allude to her running into moving traffic. According to Ms. Brown, she stepped into the parking lane, not the traffic lane. She insists she always takes care crossing streets. On October 28, the day she was forcibly taken from the street, 10 to 15 people from Project HELP "swooped down” on her and she felt "abducted”.
Throughout her testimony, Ms. Brown was rational, logical, coherent. Her use of English, both in syntax and vocabulary, is very good and bespeaks an educated, intelligent person. She displayed a sense of humor, pride, a fierce independence of spirit, quick mental reflexes. She has, by her account, developed the needed skills for surviving on the street and it is evident she does not want her condition of homelessness to be treated or viewed as a target for insults, pity or condescension by the rest of society into whose conventional pattern of living she does not fit.
She is aware of alternatives open to her and specifically identified shelters, agencies and helpful people. She considers herself an experienced street "professional”, one very capable of taking good care of herself. She has never been physically ill while on the street. In case of need, she has a network of friends, mentioned by first name, upon whose generous help she feels she can rely. She wishes to return to her life on the *1088 street, although she says, she would accept a nice apartment in a good neighborhood.
During the course of the hearing, I observed her behavior. She listened alertly, wrote notes to her attorney and comported herself in a totally reasonable manner.
My task now is to decide in the light of the evidence and the law whether Joyce Brown is to be free to return to the street or be involuntarily retained for hospital treatment.
Involuntary retention of a patient for care and treatment in a hospital under Mental Hygiene Law § 9.39 is warranted if the patient has a mental illness which is likely to result in serious harm to herself or others. Likelihood to result in serious harm is statutorily defined either as
"1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
"2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.” (Mental Hygiene Law § 9.39 [a].)
In addition to the statutory definition, decisional law holds the likelihood of serious harm exists where mental illness results in the refusal or inability to meet essential needs for food, clothing and shelter. (Matter of Carl C., 126 AD2d 640 [2d Dept 1987].)
It is the burden of the city to prove by clear and convincing evidence that the patient is both mentally ill and that as a result is likely to injure herself or others. (Matter of Carl C., supra; Matter of Harry M., 96 AD2d 201 [2d Dept 1983].)
From the testimony of the seven psychiatrists it is evident that psychiatry is not a science amenable to the exactness of mathematics or the predictability of physical laws. Examinations of the same patient resulted in disparate diagnoses. Perhaps the disparity results from the lapse of time between examinations by the two groups. The hospital staff examined Ms. Brown upon her admission on October 28 and with 48 hours thereafter, whereas the NYCLU doctors initially examined her at the earliest on October 30 and on November 1. Dr. Mahon testified that those few intervening days at the hospital provided Ms. Brown with a structured environment which permitted her to "reconstitute herself’ by the time the NY-CLU doctors saw her.
*1089 In addition, the two groups of doctors saw her under different circumstances. Project HELP brought Ms. Brown to the hospital against her will and her reaction to the "abduction” was naturally hostile and aggressive. Thus the hospital psychiatrists and staff treated a coerced, uncooperative, agitated patient, and a filthy one as well. On the other hand, when examined by psychiatrists called by her attorney, whom she did not view as enemies, she was, as described by them, "warm”, coherent, and logical. By now she was, of course, bathed and cleanly dressed. But the change in her mental state, the NYCLU psychiatrists say, could not be due to her having reconstituted herself if she is schizophrenic because the rapidity of her recovery is inconsistent with schizophrenia.
The hospital psychiatrist relied in large measure for their diagnosis on Ms. Brown’s street behavior, particularly for the conclusion that she is suicidal because she ran into moving traffic, and delusional because she destroyed paper currency. Only one doctor, however, ever saw her on the street.
I accept Ms. Brown’s version that she did not place herself in the line of moving traffic. As to her explanation for destroying paper currency (coins cannot be burned or torn) it may not satisfy a society increasingly oriented to profit making and bottom-line pragmatism, but it is consonant with safe conduct on the street and consistent with the independence and pride she vehemently insists on asserting. Apparently beggars can be choosers.
Considering all the evidence and the contradictory expert psychiatric opinions offered, I find the proof neither clear nor convincing on the question of the petitioner’s mental state. But even assuming arguendo that Joyce Brown is mentally ill, the inquiry does not stop here. The city must still prove that her mental condition is likely to result in serious harm to herself or others, as defined by statute and case law.
Is she suicidal? All seven psychiatrists agree her tests show no suicidal or homicidal ideation. The sole basis for concluding she wants to take her life is the charge she ran into moving traffic. After hearing Ms. Brown’s version of the event and the NYCLU doctors, I find no reason to believe she is suicidal.
As to the likelihood she would cause herself serious bodily harm, no proof has been offered to substantiate the claim. The fear that she may provoke others to cause her harm is without substantiation in her past history.
There is no indication whatever that she ever caused risk of physical harm to others.
*1090 I now reach the question whether she has the ability to meet her essential needs of food, clothing and shelter. (Matter of Carl C., supra.) Can she provide herself with food? The answer is yes. She eats regularly and chooses a nutritional diet of chicken, milk, juice and ice cream. She is not malnourished, the doctors all agree, and they all find her in good physical condition.
As to clothing, it must first be said that its primary function is protection against the elements. It has been testified that she was barefooted and dressed in filthy, tattered, foul-smelling clothes. Ms. Brown explained that she was given a pair of boots which she doesn’t wear because they are so large on her they cause her to trip when walking. She does, however, wear socks and keeps the boots nearby. In the winter she huddles against an air vent that blows hot air 24 hours a day, seven days a week. She does therefore keep warm. Moreover, she is physically healthy. As to the pathetic condition of her clothes, the logical inference to be drawn from that is that she is poor. The legal question before me is whether Joyce Brown is mentally capable of providing herself with clothes; the question is not whether she is financially able to do so.
Can Joyce Brown provide herself with shelter? Housing in New York is an expensive commodity, so expensive that in this rich city many no longer can afford it and are driven to live on the street. Who among us is not familiar with the tattered, filthy, malodorous presence of the wretched homeless? The tired, poor, huddled masses need no longer be invited to our shores. Our society has created them at home. The blame and shame must attach to us, not to them. The predicament of Joyce Brown and the countless homeless raises questions of broad social, economic, political and moral implications not within the purview of this court.
Joyce Brown has been on the street nearly a year. She has survived, she is physically fit. She may indeed be a professional in her life-style. To the passerby seeing her lying on the street or defecating publicly she may seem deranged. "Bitter poverty” Juvenal wrote, "has no harder pang than that it makes men ridiculous.” But how can anyone living in security and comfort even begin to imagine what is required to survive on the street? It cannot be reasoned that because Joyce Brown is homeless she is mentally ill. What must be proved is that because she is mentally ill she is incapable of providing herself with food, clothing and shelter. Yet, though homeless, she copes, she is fit, she survives.
*1091 She refuses to be housed in a shelter. That may reveal more about conditions in shelters than about Joyce Brown’s mental state. It might, in fact, prove that she’s quite sane. She refuses confinement in Bellevue’s psychiatric facilities, preferring freedom on the street with all its attendant risks.
Freedom, constitutionally guaranteed, is the right of all, no less of those who are mentally ill. (O’Connor v Donaldson, 422 US 563 [1975].) Whether Joyce Brown is or is not mentally ill, it is my finding, after careful assessment of all the evidence, that she is not unable to care for her essential needs. I am aware her mode of existence does not conform to conventional standards, that it is an offense to aesthetic senses. It is my hope that the plight she represents will also offend moral conscience and rouse it to action. There must be some civilized alternatives other than involuntary hospitalization or the street.
Project HELP, the Mayor’s program, is a first step in the right direction towards helping the homeless mentally ill. Joyce Brown, however, does not fall within the ambit of that program.
The petition is granted. An order releasing her will be signed by this court.