*655 OPINION OF THE COURT
Herbert A. Posner, J.
The recent notoriety of the "Billie Boggs” case has made the general public aware of the sensitive conflict between government’s desire to protect mentally ill people and the individual’s desire not to be confined to a mental institution. The trauma of the "Snake Pit” is too vivid in people’s minds. Like "Billie Boggs”, the respondent, Jason DePass, fought vigorously the effort by Hillside Hospital to have him involuntarily committed to Creedmoor State Hospital.
Jason DePass had admitted himself voluntarily to Hillside on June 6, 1987. When he sought to be discharged, the doctors at that hospital, in their infinite wisdom, decided Jason belonged in a mental institution. They then brought on this petition, pursuant to section 9.13 of the Mental Hygiene Law, and a hearing, as required by statute, was held at Creedmoor on July 7, 1987.
At the hearing, the hospital relied solely on the testimony of the treating psychiatrist, Dr. Jacques Vital-Herne. Dr. Vital-Herne claimed that the patient was in need of care and treatment. According to the doctor, Jason DePass suffered from a mental illness known as schizophreniform disorder. Prior to admission, the patient believed that his body was transforming into a woman’s body. When admitted as a patient, his delusions had "worsened” and he believed he was pregnant and that his genitals were shrinking or disappearing. With medication, the patient improved slightly and no longer believed he was pregnant, but the delusions concerning his genitals persisted and he had paranoid beliefs that people were talking about his sexual preferences and his appearance. It was the doctor’s opinion that Jason DePass continued to require hospitalization because the patient’s judgment was still so impaired that he could act on his delusions and this could be dangerous. For instance, Jason DePass might act on the delusion that he needed an operation to change the size of his penis or engage in nonstandard treatment to alter his hormonal balance.
Whether the testimony at the hearing was sufficient to sustain the application for the involuntary retention of Jason DePass depends on the standard to be followed for such *656 retention.* The Director of Mental Hygiene Legal Services, appearing on behalf of Jason DePass, contended that before a person can be institutionalized against his will, it must be established by clear and convincing evidence that he poses a danger to himself or others. The attorneys for the hospital countered that the standard for involuntary retention in Mental Hygiene Law § 9.13 (b), "in need of involuntary care and treatment,” requires only proof that such hospitalization is essential to the patient’s welfare and not a showing of dangerousness. Hillside Hospital relied primarily on the fact that the physician’s certificate which accompanies an application for involuntary retention under section 9.13 calls for a statement by the doctor that the patient:
1. has a mental illness;
2. requires as essential to his welfare, care and treatment as a patient in a hospital;
3. is so impaired in his judgment that he is unable to understand the need for such care and treatment.
If these are the criteria to be followed, there is no doubt that Jason DePass should be involuntarily retained in an institutional setting. It is therefore understandable why Dr. Vital-Herne came to the conclusion that Jason DePass should be committed to Creedmoor. However, the criteria in the physician’s certificate were formulated by the New York State Department of Mental Hygiene, the executive branch, and are based upon the Department’s interpretation of the Mental Hygiene Law. It is the function of the judiciary to determine whether the statutory standard is being interpreted correctly and, if so, whether it violates the patient’s constitutional rights.
The standards and procedures for the civil commitment of mentally ill persons in New York State are found in article 9 of the Mental Hygiene Law. Sections 9.37 and 9.39, which contain the requirements for emergency admissions, provide for the involuntary admission of a person who has "a mental *657 illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.” (Mental Hygiene Law § 9.39 [a].) The person may be admitted under section 9.37 upon application of a director of community services or his designee and, under section 9.39, upon application of the director of a hospital for the mentally ill. Likelihood to result in serious harm to himself or others is defined under both of these sections as:
"(1) substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or
"(2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm.”
Thus, for an emergency admission under section 9.37 or 9.39, there must be affirmative overt conduct (a recent overt act), evidencing a substantial risk of physical harm (dangerousness to himself or others). These requirements have insulated sections 9.37 and 9.39 from constitutional attack. (See, Project Release v Prevost, 722 F2d 960, 972.)
The criteria for nonemergency admissions, which are found in sections 9.13 and 9.27, are less stringent than those for emergency admissions under sections 9.37 and 9.39. Section 9.13 of the Mental Hygiene Law provides for the admission of "any suitable person in need of care and treatment, who voluntarily makes written application therefor.” This section also provides that a voluntarily admitted patient who seeks to be released may be retained as an involuntary patient, for not more than 60 days, upon application of the hospital director if, following a hearing, the court determines "that the patient is mentally ill and in need of retention for involuntary care and treatment in the hospital” (§ 9.13 [b]). Section 9.27 (a) provides for the admission of "any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians”.
The same phrase "in need of involuntary care and treatment” is used as the standard for involuntary commitment in both sections 9.13 and 9.27. It is defined, in section 9.01, to mean "that a person has a mental illness for which care and treatment as a patient in a hospital is essential to such person’s welfare and whose judgment is so impaired that he is *658 unable to understand the need for such care and treatment.” This standard, however, has been narrowed by judicial restrictions which have resulted from the 1975 decision of the United States Supreme Court in O’Connor v Donaldson (422 US 563), that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends” (supra, at 576).
Two years later, the New York Appellate Division, Third Department, in Matter of Scopes (59 AD2d 203), was called upon to decide whether continued confinement of a person who posed no threat of harm to himself or others, but was in need of treatment, violated that person’s constitutional rights. This issue had been specifically left undecided in the O’Connor case (supra, at 573). The New York court concluded that such confinement violated due process and that "the continued confinement of an individual must be based upon a finding that the person to be committed poses a real and present threat of substantial harm to himself or others”. (Matter of Scopes, supra, at 205.) The Third Department also adopted the standard of "clear and convincing evidence” of dangerousness, later approved by the United States Supreme Court in Addington v Texas (441 US 418, 432), but rejected a requirement of a recent overt act.
In 1983, a direct due process challenge of the standard for involuntary commitment embodied in sections 9.13 and 9.27 of the New York Mental Hygiene Law was considered by the Federal courts. (Project Release v Prevost, supra.) The Court of Appeals, Second Circuit, concluded that this standard "comports with the constitutional minimum set forth in O’Connor, ” but that it did so only "as narrowed by the New York state court’s holding in Scopes, which requires dangerousness” and prevents the "erroneous confinement of nondangerous persons who could survive in the community” (supra, 722 F2d, at 973).
These decisions make it clear that a showing of "dangerousness” is constitutionally required for the involuntary commitment of a mentally ill person, whether it is a nonemergency hospitalization under sections 9.13 and 9.27, or an emergency admission under sections 9.37 and 9.39 of the New York Mental Hygiene Law. Acknowledging this fact, the Appellate Division, Second Department, in a proceeding for the involuntary retention of a mentally ill person, recently stated that: "In order for the State to confine a person to a mental institution against his will, the law requires more than a mere *659 showing of mental illness. Rather, the State must prove, by clear and convincing evidence, that the person is mentally ill and that he poses a substantial threat of physical harm to himself or others.” (Matter of Carl C, 126 AD2d 640.) The Second Department then concluded that although there was no question that the patient in that case was mentally unstable, there was no factual support for the doctor’s conclusory assertion that he was dangerous to himself.
There was also no factual support for the conclusion of the treating psychiatrist, Dr. Vital-Herne, that the patient in this case, Jason DePass, was dangerous to himself. The doctor’s concern that Jason DePass might act on his delusions and seek an operation to change the size of his penis or engage in nonstandard treatment to alter his hormonal balance, without more, does not satisfy the requirement of clear and convincing evidence that the patient posed a substantial threat of physical harm to himself. Although proof of a recent overt act was not necessary, the psychiatrist was required to state the facts which led him to the conclusion that the patient was a danger to himself. There was no history of the patient having sought or obtained unorthodox treatment which might be dangerous, nor any basis for finding that he might do so in the future. On the contrary, when his aberrations were most pronounced, Jason DePass was voluntarily admitted to a hospital that treated mental illness. While it was clear from inappropriate remarks he made at the hearing that Jason DePass was mentally unstable, the hospital failed to prove the patient posed a substantial threat of physical harm to himself or others or was unable to meet his essential needs for food, clothing and shelter. Therefore, the criteria for involuntary retention of Jason DePass were not met.
Jason Depass was involuntarily retained by the hospital, pending a hearing and determination, as the result of an application for his commitment that was based upon a physician certifying only that care and treatment was essential to his welfare. This procedure violated his due process rights and it must be discontinued.
While members of the legal profession can be expected to know that the phrase "essential to his welfare” has been judicially construed as meaning "that the person to be committed poses a real and present threat of substantial harm to himself or others” (Matter of Scopes, supra, at 205), such knowledge cannot be attributed to persons who are not attorneys. It was this realization that led the Second Department *660 to reject, as misleading, a jury instruction that employed similar statutory language, and to require that "a charge must include a directive to the effect that a patient may not be retained involuntarily unless the State establishes, by clear and convincing evidence, that he poses a substantial threat of physical harm to himself or others, and that such a threat can result from a failure to meet his essential need for food, clothing or shelter.” (Matter of Harry M., 96 AD2d 201, 208.) Similar language must be used in the physician’s certificate that accompanies an application for involuntary retention under section 9.13. Rather than merely reciting that the patient requires care and treatment in a hospital "as essential to his welfare”, the physician must certify that the patient poses a threat of substantial harm to himself or others. A patient has a due process right to a such a certification before a proceeding for involuntary commitment can be commenced.
Accordingly, this application for the continued involuntary hospitalization of Jason DePass, pursuant to section 9.13 (b) of the Mental Hygiene Law, is denied.

 Although following the hearing, Jason DePass was discharged by the psychiatric facility after leaving on a temporary pass and refusing to return, the issue raised here is not moot since it is likely to recur with respect to other patients and may continue to evade judicial review because of the short period (not more than 60 days) that involuntary retention of a voluntarily admitted patient is permitted under section 9.13. In view of this, the important due process question of the standard to be followed for such an involuntary commitment merits determination by this court. (See, Matter of Harry M., 96 AD2d 201, 202, n.)