OPINION OF THE COURT
John A. Milano, J.
This action is predicated upon the application of Creedmoor Psychiatric Center (hereinafter Creedmoor) for, inter alla, an order pursuant to Mental Hygiene Law § 9.33 to involuntarily *46 retain Elaine B. as a patient at Creedmoor for a period of up to six months. A hearing of this application was demanded on behalf of Elaine B. by her legal representative, Mental Hygiene Legal Services, pursuant to Mental Hygiene Law § 9.33 (c).
The uncontroverted facts are that Elaine B. is a 61-year-old, divorced, white female. She has lived in Spain for at least the past 12 years and traveled through Europe prior to that. She was born and raised in the midwest and attended college in Illinois.
Elaine B. arrived in New York from Spain towards the end of 1989 or early 1990. In February 1990 she was involuntarily retained at Bellevue Hospital for psychiatric treatment. After a hearing she was released pursuant to court order. After release from Bellevue, she resided for a time at a Manhattan shelter for the homeless. She became infested with body lice at that shelter. Elaine B. claims she was infested intentionally by other shelter residents. Fearing for her safety, due to the lice incident and claims of threats to her life, she left the shelter. Eventually, she arrived at John F. Kennedy Airport (hereinafter JFK or the airport) and commenced living at the airport. She became known to airport personnel as one of the homeless people living at JFK.
In early September 1990, she was taken involuntarily by police as an emergency patient to the Elmhurst Hospital Center. The police familiar with her situation, cited her homeless condition, bizarre behavior, and the concern of airport personnel, as the reason for her removal to Elmhurst. Creedmoor records state that Ms. B. had advised the police that she was waiting at the airport to meet with the FBI and President Bush.
At Elmhurst Hospital she was deloused and transferred as an emergency patient to Creedmoor on September 7, 1990. After examination by Creedmoor staff she was admitted involuntarily pursuant to Mental Hygiene Law § 9.27 (a) upon the certificate of two examining physicians.
The involuntary admission pursuant to Mental Hygiene Law § 9.27 expired on November 5, 1990. On that date an application was made by Creedmoor to retain Elaine B. as an involuntary patient pursuant to Mental Hygiene Law §9.33. An order was signed by Hon. Robert L. Nahman, J.S.C. pursuant to the section 9.33 application, appointing Dr. Azariah Eshkenazi to examine Elaine B. and testify at the hearing scheduled for January 8, 1991.
*47 The hearing of this application was presided over by Hon. Alfred D. Lerner, J.S.C. Present on the Bench with Justice Lerner for the entire proceeding was the Hon. John A. Milano, J.S.C.
At the January 8 hearing, Dr. Eshkenazi testified that based upon his examination of Elaine B., he found her to be delusional, and her hostile screaming at him, as well as her behavior, was inappropriate to the situation. He further stated that her behavior was indicative of someone who was psychotic. Upon inquiry by Elaine B.’s counsel and the court, Dr. Eshkenazi admitted that he had spent only about 10 minutes with Elaine B. because she refused to cooperate.
Testimony was also given by Elaine B. herself who testified that she understood the legal proceeding as well as any layman. Further, she believes she was fully capable of making appropriate decisions as to her welfare. She was not of the opinion that she was mentally ill. She pointed out that this was her second mental hygiene hearing and at the prior hearing the court found she did not require commitment, and she was released.
She testified as to her family history and related a tragic story of how she was divorced, had lost a daughter to suicide and a brother in a plane crash. She stated that she was an artist and had been living in an artist colony near Malaga, Spain, for at least the past 12 years. She claimed that she returned to the United States to attend to certain business affairs, including the collection of moneys due to her arising out of a mortgage. She further related the difficulties she had encountered since arriving in New York and how she wanted to collect her money and go back to Spain. She denied having stated at the airport that she was waiting for the President. She did say that she tried to contact the FBI because she prefers to stay in contact with appropriate authorities when she is in strange surroundings. She also related how she was in contact with the Traveler’s Aid Society and various consular offices.
Her testimony was presented in a coherent manner and Elaine B. could be characterized as highly intelligent. She could also be easily characterized as being eccentric and provocative. It was by no means clear that she was psychotic. Predicated upon her demeanor at the trial and cursory examination of Dr. Eshkenazi, the court directed examination by a second independent psychiatrist. The continued hearing was then scheduled for February 5,1991.
*48 On February 5, 1991, the hearing was continued with Justice Milano presiding, having obtained the consent of all parties. The independent psychiatrist, Dr. Jack Praver, had conducted a thorough evaluation of Elaine B. and submitted a written report in addition to his testimony at trial.
Quoting in pertinent part from Dr. Praver’s written report he found:
"In summary patient was reasonably cooperative, lucid and free of psychotic manifestations. Her intelligence is superior and well preserved. She is a somewhat litigious and highly eccentric person whose misinterpretations causes increased suspiciousness.
"diagnosis: Paranoid disorder.
"recommendation: Patient has been hospitalized for almost 5 months with an unwillingness to cooperate with any therapeutic protocol. She is not amenable to logical persuasion. I fail to see the necessity to keep this burdensome patient any longer, especially in view of the fact that she does not currently present a danger to herself or to others and further interference and restraint will embitter her. It would be humane and beneficial if the Social Service Department assist her to obtain monies from her family or possibly a state agency in order to obtain a ticket for her trip back to her residence in Spain where she conducted a seemingly productive life as an artist.”
Elaine B. again testified in a coherent logical manner and exhibited an understanding of the difficulties she faced as a person who was without a home, money or family in New York. The court was troubled, however, by her statement that if she had no other options she would return to the airport.
In making a determination as to Creedmoor’s application for retention, the court must look to article 9 of the Mental Hygiene Law as well as the pertinent case law decisions. In Matter of Edward L. v Pilgrim, Psychiatric Center (137 AD2d 818, 819), the Appellate Division, Second Department, held: "In order to obtain or continue an order of commitment, the hospital must establish by clear and convincing evidence, not only that the patient is in need of further care and treatment, but that the patient is mentally ill and poses a substantial threat of physical harm to himself or others”.
The Appellate Division, Second Department, has provided further clarification of what constitutes mental illness that poses substantial threat of serious harm to himself. In Matter *49 of Boggs v New York City Health & Hosps. Corp. (132 AD2d 340, 362), the Appellate Division, First Department, has stated: "It is well established in this State that a person may be involuntarily confined for care and treatment, where his or her mental illness manifests itself in neglect or refusal to care for themselves to such an extent that there is presented 'serious harm’ to their own well-being (see, for example, Matter of Scopes, 59 AD2d 203, 205 [3d Dept 1977]; Matter of Carl C., 126 AD2d 640 [2d Dept 1987]).”
In considering whether a person’s mental illness poses a substantial threat of physical harm, the Appellate Division, Second Department, in Matter of Carl C. (126 AD2d 640, supra), found "Such a threat can result from a refusal or inability to meet his essential needs for food, clothing or shelter”. (See also, Matter of Harry M., 96 AD2d 201.) Suicidal tendencies also constitute a substantial threat. (See, Matter of Anonymous v Kings County Hosp. Center, 115 AD2d 513.)
The sole fact that a person is eccentric or even mentally ill is insufficient, in and of itself, to justify involuntary commitment. In addition to the mental illness, the court must also find "a substantial threat of physical harm”. (Matter of Edward L. v Pilgrim Psychiatric Center, supra, at 819.) Without a finding of both elements, involuntary confinement is too great a curtailment of constitutional liberties.
The Appellate Division, Second Department, in Matter of Edward L. (137 AD2d 818, 819) opined: " ' "(T]t is possible for many non-violent persons who suffer from a mental disease * * * to live outside of an institution, and when they do so, regardless of the wisdom of their decision or the strength of their reasoning powers, they have their constitutional right to follow their own desires” ’ (Matter of Harry M., supra, at 207, quoting Kendall v True, 391 F Supp 413, 418).”
In the case currently before this court there has been no claim by Creedmoor that Elaine B. posed any threat to others. There is no need therefore for the court to consider that issue.
As to the issue of whether Elaine B. represents a threat to herself, there has been no proof that she suffers from any eating disorder or that she does not properly clothe herself. No claim has been made as to suicidal tendencies. As to her ability to provide shelter, the court is troubled by Elaine B.’s statements that she would probably return to JFK. The court is convinced however, that her return to the airport is symptomatic of a lack of alternatives and not indicative of a failure *50 to comprehend the need for shelter. Elaine B. did in fact survive at the airport for a number of months. The court after viewing the demeanor and hearing the testimony of Elaine B. did not find any critical impairment of insight. Dr. Praver, the respondent psychiatrist, recommended release.
Applying the evidence presented at the hearing to applicable statutory and case authority, this court concludes that Creedmoor has failed to meet its burden of proving by clear and convincing evidence the need for involuntary commitment. Were the court’s only obligation the rendering of quick decisions, this matter would be concluded herewith. However, this court believes it must assume a greater responsibility to the public, and to the respondent herein. Unfortunately, this case is only one of many troubling situations involving the homeless and the emotionally or mentally disturbed.
Creedmoor had failed to meet the burden of proving that Elaine B.’s mental condition is of sufficient severity to warrant the constitutional infringement of an involuntary commitment. However, to simply release her back onto the streets with no money, no place to go and no one to help her, would likely result in having a new proceeding commence for her six months hence after she is picked up again by police for observation. Notwithstanding the fact that Elaine B. has been incensed at being held at Creedmoor against her consent, she has nevertheless done well in the structured setting. While keeping to herself, she has presented no problems and has assisted the staff, performing such duties as helping to make beds and helping other patients.
Rather than immediately denying Creedmoor’s application, this court conducted lengthy conferences amongst the representatives of Creedmoor, Elaine B.’s attorney, and the independent psychiatrist. Elaine B. was also involved in these conferences. Prior to the hearing, the court had requested that Elaine B.’s attorney, G. W. Kaplan, Esq., of Mental Hygiene Legal Services, attempt to contact the family and friends to whom Elaine B. referred. Unfortunately, Mr. Kaplan’s efforts proved fruitless. After considerable exploring of alternatives, it was agreed that a voluntary admission to Creedmoor pursuant to section 9.13 of the Mental Hygiene Law may be the best solution for all parties involved. Elaine B. was satisfied with this solution and agreed to seek such voluntary admission. Further, Mr. Kaplan graciously agreed to assist her if possible in her quest to obtain moneys arising out of a mortgage she claimed was due to her. It was agreed by all parties *51 that it would be beneficial to Elaine B. to receive therapy and shelter at Creedmoor until such time as she could obtain moneys which would allow her to function in a more conventional mode in outside society. This plan was accomplished with the consent of all parties, absent any curtailment of constitutional liberties. The order of this court was in no way conditioned upon Elaine B.’s agreement to seek voluntary admission.
[Portions of opinion omitted for purposes of publication.]