In the Matter of BILLIE BOGGS, an Alleged Mentally Ill Patient, Respondent, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION et al., Appellants.

First Department, December 18, 1987

## APPEARANCES OF COUNSEL

*Robert M. Levy* of counsel *(Norman Siegel* and *Eric Friedberg,* attorneys), for respondent.

*Paul T. Rephen* of counsel *(Leonard Koerner* and *June A. Witterschein* with him on the brief; *Peter L. Zimroth, Corporation Counsel,* attorney), for appellants.

## OPINION OF THE COURT

Ross, J.

In this appeal, this court must face the difficult dilemma that occurs every time a balance must be struck between an individual's freedom, and the State's right to involuntarily confine such individual, in a mental hospital for treatment, when he is a danger to himself.

The precise issue presented to us is whether the respondents, New York City Health and Hospitals Corporation (NYCHHC), and Bellevue Hospital (Bellevue), have presented clear and convincing evidence that the petitioner is suffering from a mental illness, which requires her immediate involuntary commitment, to a hospital for care and treatment, since allegedly, if such illness is left untreated, it will likely result in serious harm to the petitioner.

While "[f]or many centuries, sovereign power has been exercised to confine mentally ill persons * * *[,] [i]t was in the nineteenth century that mentally ill persons first came to be seen as sick rather than cursed and as susceptible to aid

through proper treatment * * * [and] this attitude was gradually reflected in new legal procedures for deciding who should be confined in mental hospitals" (Note, *Civil Commitment of the Mentally Ill: Theories and Procedures,* 79 Harv L Rev 1288 [1966]).

In many of the States of this Nation, including our own, the decision "to confine a person for compulsory psychiatric treatment * * * [is conditioned] not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself [or herself] or to others, is great enough to justify such a massive curtailment of liberty" *(Humphrey v Cady,* 405 US 504, 509 [1972]).

The United States Supreme Court in *Addington v Texas* 441 US 418 [1979]) held that "clear and convincing proof" is required by the Fourteenth Amendment of the US Constitution to involuntarily commit an individual to a mental hospital in a proceeding brought under State law. Chief Justice Burger, writing for the court in *Addington v Texas (supra,* at 425-428, 431), sets forth, in pertinent part, the reasoning by which that court arrived at the "clear and convincing" standard:

"This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection * * * Moreover, it is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual * * *

"The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; [and] the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill * * *

"Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior * * *

"We conclude that the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence * * *

"There are significant reasons why different standards of proof are called for in civil commitment proceedings as opposed to criminal prosecutions. In a civil commitment state power is not exercised in a punitive sense * * *

"In addition, the 'beyond a reasonable doubt' standard historically has been reserved for criminal cases * * *

"[Since we have] concluded that the preponderance standard falls short of meeting the demands of due process and that the reasonable-doubt standard is not required, we turn to a middle level of burden of proof [clear and convincing] that strikes a fair balance between the rights of the individual and the legitimate concerns of the state".

Ms. Billie Boggs (Ms. Boggs) is a 40-year-old woman, whose real name is Ms. Joyce Brown. She chooses to use the name Ms. Billie Boggs since she admires a television personality of that name, and she desires to thwart her family's efforts to locate her. For the past year, Ms. Boggs has lived on the public sidewalk in front of a restaurant, located on 65th Street and Second Avenue, in New York County, and she has used this location as her bedroom, toilet and living room.

Over the course of the subject year, Ms. Boggs has been observed on an almost daily basis by persons affiliated with Project HELP, which is an emergency psychiatric service for allegedly mentally ill homeless persons, who live on the streets in New York City. The personnel of this organization are comprised of a clinical team of psychiatrists, nurses and social workers, who travel around New York City, for the purpose of identifying persons who live in the street and who appear to be particularly in need of immediate psychiatric hospital treatment, due to the fact that those persons appear to be in danger of doing serious harm to themselves or others.

On October 28, 1987, Dr. Lincoln Robert Asher Hess (Dr. Hess), who is a psychiatrist with Project HELP, determined, after a number of observations of Ms. Boggs, at her location on the pavement, that Ms. Boggs was severely mentally ill, and that she needed *immediate hospitalization,* since she posed a danger of serious harm to herself. Thereafter, Project HELP arranged for Ms. Boggs' transportation, against her will, to Bellevue, pursuant to section 9.39 of the Mental Hygiene Law. In pertinent part, subdivision (a) of section 9.39 of the Mental Hygiene Law authorizes a hospital to receive and retain as a patient, for a period of 15 days, any person "alleged to have a mental illness for which immediate obser-

vation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to [herself] or others".

The next day, following her hospitalization, on October 29, 1987, Ms. Boggs gave notice that she wished to challenge her involuntary hospitalization and requested a hearing pursuant to section 9.31 of the Mental Hygiene Law and instituted the instant proceeding in the Supreme Court, New York County, against respondents the NYCHHC and Bellevue. Respondents NYCHHC and Bellevue opposed.

A hearing was conducted, and both the petitioner and respondents presented evidence. Ms. Boggs was present and represented by counsel throughout the hearing. Her counsel, upon her behalf, waived all of her rights of confidentiality and consented to have the press attend the hearing. The transcript of the hearing is approximately 600 pages.

The respondents presented their case first, in opposition to Ms. Boggs' release, and that case consisted of the testimony of four psychiatrists (Drs. Hess, Maeve Mahon [Dr. Mahon], Albert Sabatini [Dr. Sabatini], and Luis R. Marcos [Dr. Marcos]); Ms. Jane Putnam (Ms. Putnam), who is a psychiatric social worker; Ms. Willie Mae James (Ms. James), who is Ms. Boggs' older sister; and Mr. Mark Lerner (Mr. Lerner), who took a number of photographs of Ms. Boggs living in the street.

On direct examination, Dr. Hess, after his qualification as an expert by the court, testified that he works as a psychiatrist with Project HELP three days a week; in the course of his duties with Project HELP, he first saw Ms. Boggs in the street on July 23, 1987; on that occasion, he approached her, with the knowledge that Ms. Boggs had exhibited hostility to Project HELP's staff in the past; he observed that Ms. Boggs was dressed in disheveled clothing; although it was not raining, Ms. Boggs was twirling an open umbrella to avoid eye contact with him and the persons passing by; at that time, Dr. Hess heard Ms. Boggs speaking in rhymes, and, according to the witness, the content of these rhymes was sexual, and related to Dr. Hess' and Ms. Boggs' genitals; in the witness' professional opinion, this type of verbalization is referred to as "clanging", and is indicative of a thought disorder, in which a person transfers their thinking from one thought to another without any logical sequence.

The second time Dr. Hess observed Ms. Boggs in the street

was five days later, on July 28, 1987. Since the first time that he had seen her, Dr. Hess testified, in substance, that Ms. Boggs' clothing had become more disheveled, dirty and torn, and she was barefoot. When Dr. Hess attempted to speak to Ms. Boggs, she cursed him, flipped open her skirt and exposed her nude buttocks, and made references to his genitals. In Dr. Hess' professional opinion, on July 28th, Ms. Boggs appeared to be flat, and disordered, which he testified is characteristic of schizophrenia.

Dr. Hess made his third street observation of Ms. Boggs on September 22, 1987. As before, Dr. Hess found Ms. Boggs at the same location, which was the sidewalk at Second Avenue near 65th Street. In pertinent part, Dr. Hess testified that Ms. Boggs' clothes were even dirtier than before, and torn to the point that large portions of her torso were exposed, and her clothing was inadequate for the weather; her hair was matted; he noticed the smell of urine and feces emanating from her; he saw pieces of United States currency, which had been torn up in neat pieces stuck to the sidewalk near Ms. Boggs, upon which she appeared to have urinated; Ms. Boggs cursed and shouted obscenities at him; nevertheless, Ms. Boggs did accept food from him, after first refusing it, but, after accepting same, she then threw the contents of this lunch at Dr. Hess, and chased him around the corner. On this occasion of September 22nd, Dr. Hess evaluated Ms. Boggs as having angry, threatening, and intensely hostile feelings, and "again there was a sign of throatiness in the sense there was no modulation".

In evaluating Ms. Boggs, Dr. Hess considered his personal observations, her history, and information he received from other Project HELP members, such as psychiatrists, nurses and social workers. As a result of this data, Dr. Hess was of the opinion that Ms. Boggs exhibited a deteriorating psychosis and a deteriorating ability to care for herself. For example, he had received information that Ms. Boggs had run out into the traffic to throw away warm clothing that she had received from personnel representing Project HELP.

Finally, on October 28th, Dr. Hess observed Ms. Boggs lying at her location with her head resting on a cardboard box. She smelled strongly of feces, and Dr. Hess again saw torn currency stuck to the pavement and stained by urine. The currency was very neatly torn and urinated upon, and Dr. Hess testified that this was a ritualistic tearing, which suggested magical thinking or delusion. She said repeatedly to Dr. Hess,

"What is my name?", which is also indicative of a thought disorder.

In conclusion, on his direct testimony, Dr. Hess diagnosed Ms. Boggs as a chronic schizophrenic, paranoid type. Moreover, he stated in his medical opinion, if she were left in the street, she would be a danger to herself, since she was incapable of accepting food, clothing or shelter, and his diagnosis of her illness was extremely poor. In his view, at this point on October 28th, the least restrictive alternative was to hospitalize Ms. Boggs.

Dr. Hess testified, in answer to the question, what would happen if Ms. Boggs was discharged at present, that, in his opinion, her psychosis would continue to deteriorate, and that her explosive anger and hostility would continue.

In his cross-examination, Dr. Hess stated, in substance, as follows: his first three observations of Ms. Boggs, prior to October 28th, were brief; he agreed that many of Ms. Boggs' sentences were syntactical; although he elicited no delusions or hallucinations from Ms. Boggs, that did not mean that Ms. Boggs did not suffer from delusions or hallucinations; he admitted that, while he saw stains on the street, he had never actually seen Ms. Boggs urinate or defecate on the street; he observed her huddled in a fetal position by a hot air vent, but he did not know whether or not Ms. Boggs was cold; he did observe escalating, aggressive, violent behavior; he testified that Ms. Boggs' psychosis had worsened over the months; she was increasingly less inhibited and she took greater risks with her life; and, based upon her deteriorating condition, he concluded that she was a danger to herself.

Ms. Putnam was a psychiatric social worker, who had been the coordinator of Project HELP for five years and she was qualified by the court as an expert psychiatric social worker. In substance, Ms. Putnam's testimony on direct examination was as follows: she first met Ms. Boggs in December of 1986, as a result of Ms. Putnam having received many calls from people in the community who were concerned about Ms. Boggs' well-being; when she first saw Ms. Boggs in December, Ms. Boggs appeared to her to be inadequately clothed for the weather, and generally appeared to be dirty and disheveled; however, when Project HELP offered Ms. Boggs their services, Ms. Boggs responded by shouting obscenities at them; however, Project HELP continued to view Ms. Boggs almost daily, and their conclusion was that she was inappropriately

dressed, frequently barefoot, and always screamed obscenities at the Project HELP people to get away.

According to Ms. Putnam, as Project HELP observed Ms. Boggs, over the course of the year, her behavior changed for the worse. In the winter of 1986-1987, Ms. Boggs appeared to be passive, but by the spring, Ms. Boggs became more aggressive.

On May 8, 1987, Ms. Putnam personally observed an incident, involving Ms. Boggs' hostile reaction to some deliverymen, who were across the street from her location. These men were gathered outside a restaurant, apparently making a delivery. Suddenly, according to Ms. Putnam, Ms. Boggs began screaming racial epithets at these men, calling them "f...... n......, b...... s..." shouting at them to get away from her, and cursing at them. As a result of this incident, Ms. Putnam became concerned that Ms. Boggs might be assaulted, due to her provocative behavior, and Ms. Putnam perceived that Ms. Boggs might have delusions regarding black men, whom she believed treated her as a prostitute. Also, Ms. Putnam reported her May 8, 1987 observation about Ms. Boggs' reaction to the deliverymen, to Project HELP psychiatrists.

At this point, we note that our opposing brethren make a number of references to the incident which occurred between Ms. Boggs and the black deliverymen, and conclude on a number of pages of their writing, "what precipitated this incident is unknown". The record is simply to the contrary, since Ms. Putnam, the only eyewitness to the incident, who testified at the hearing, stated that Ms. Boggs' verbal assault on the deliverymen was totally unprovoked. This testimony of Ms. Putnam is unrebutted.

In summary, Ms. Putnam testified concerning Project HELP's year-long observation of Ms. Boggs, as follows: that Ms. Boggs used an umbrella to keep a distance between herself and others, but she did not use the umbrella to protect herself from the rain; that Ms. Boggs' behavior became steadily more aggressive; that she addressed Ms. Putnam as a "white bitch"; moreover, the witness personally observed fecal matter on the sheets which Ms. Boggs wrapped around herself; and the witness had personally seen Ms. Boggs urinate and defecate in the street.

In Ms. Putnam's professional opinion, Ms. Boggs could not at this time live in the community. Furthermore, Ms. Putnam testified that Ms. Boggs cannot, at this time, be an outpatient

in view of her low level of self-care, and Ms. Boggs would, if not hospitalized, deteriorate in a few days.

After her direct examination, Ms. Putnam testified, in substance, on cross-examination, as follows: she admitted that homeless people wear disheveled clothing; she stated that, prior to Ms. Boggs' taunts to the deliverymen, those men had not said anything to provoke Ms. Boggs; that based upon Ms. Boggs' aggressive behavior and her use of racial slurs against total strangers, she believed that Ms. Boggs was in danger of being assaulted.

The next witness, for the respondents, was Dr. Mahon, who was Ms. Boggs' treating psychiatrist at respondent Bellevue. Before testifying, Dr. Mahon was qualified by the court as an expert in psychiatry. Also, prior to Dr. Mahon's testimony, the Bellevue Hospital record regarding Ms. Boggs, was received in evidence, and Dr. Mahon used that record during her testimony.

In substance, Dr. Mahon testified, on her direct examination, that she had last examined Ms. Boggs on the morning of the hearing.

According to Dr. Mahon's testimony, the Bellevue Hospital record indicated that Ms. Boggs was admitted on October 28, 1987, and contained the notations of the admitting physician, who was a Dr. Gabriel; and Dr. Gabriel's notations in the record indicated that Ms. Boggs had told him that she had run into traffic, and that she had a right to do so; she said that if she got hurt, it was nobody's business but her own; she admitted to him that she urinates and defecates in her clothing; he admitted Ms. Boggs, relying on her history of deteriorating self-care and increasing hostility; and, finally, Dr. Gabriel found that Ms. Boggs' "affect" was loose, inappropriate, and her understanding of her illness appeared to be nil.

Dr. Mahon, herself, first saw Ms. Boggs on October 29th; at that time, Dr. Mahon did not speak with Ms. Boggs, since Ms. Boggs was hostile, angry, and used threatening gestures; verbally, Ms. Boggs was obscene and loud. Thereafter, Dr. Mahon saw Ms. Boggs on October 30th; and, on that date, Ms. Boggs appeared to be less angry and Dr. Mahon spent about 30 minutes with her.

On October 30th, Ms. Boggs, in substance, told Dr. Mahon that she had been living in the street for approximately five years, and that, prior to moving into the streets, she had been living with a man with whom she had a 15-year relationship;

and Ms. Boggs stated that she had been using cocaine and heroin; and, when Dr. Mahon asked if Ms. Boggs had defecated in her clothing, Ms. Boggs responded "where else do you think I would defecate". Incidentally, Ms. Boggs had lied to Dr. Mahon about having lived in the street for approximately five years, since subsequent evidence proves that she had been living on the street for approximately one year, and also her statement to Dr. Mahon that she had a 15-year relationship with a man was also false, as proved by later evidence.

Over the next few days, Dr. Mahon believed that she established a trusting relationship with Ms. Boggs. Dr. Mahon did note that when she saw Ms. Boggs on the second occasion of October 30th, Ms. Boggs' speech appeared to be "pressured", which meant to Dr. Mahon, as a psychiatrist, that she could not stop Ms. Boggs' train of thought or interrupt her.

The third time Dr. Mahon saw Ms. Boggs was on October 31st. Dr. Mahon noted that on each encounter, Ms. Boggs and Dr. Mahon established more of a relationship, so that on October 31st, Ms. Boggs requested that Dr. Mahon arrange for her to have the dietician serve chicken salad. In Dr. Mahon's mind, the ordering of chicken salad by Ms. Boggs was a positive statement, in that Ms. Boggs appeared to be acknowledging Dr. Mahon as her psychiatrist.

For example, Ms. Boggs now told Dr. Mahon that she did not have any friends and had never had any; she had finished high school and claimed that her boyfriend took care of her. Dr. Mahon found Ms. Boggs still gave inappropriate and irrelevant answers from time to time in their conversations together. When Dr. Mahon asked her how she cleaned herself on the street, Ms. Boggs began to talk about chicken salad. Thereafter, Ms. Boggs discussed political issues. Furthermore, Ms. Boggs explained that she earned money to get people's respect.

In Dr. Mahon's opinion, Ms. Boggs suffered from delusions. For example, during the first session, Ms. Boggs told Dr. Mahon that she thought she was going to be killed in the hospital, since she allegedly saw another female patient standing at the end of her bed. In all, Dr. Mahon found Ms. Boggs' judgment to be impaired.

Finally, on November 2nd, the morning of the hearing, Dr. Mahon saw Ms. Boggs again, and found her to be bright, verbal and oriented, as to time and place. Furthermore, that morning Ms. Boggs was more cooperative than ever, even allowing Dr. Mahon to ask her to interpret certain proverbs.

In her diagnosis, Dr. Mahon found Ms. Boggs to be a chronic schizophrenic, access one, paranoid type. Moreover, Dr. Mahon stated that Ms. Boggs' mental condition had improved during her hospitalization at Bellevue, and that it was very common for a patient like Ms. Boggs to stabilize in a structured setting. Furthermore, Dr. Mahon thought that some of Ms. Boggs' improvement may have been due to a dose of medication, "Heloperidol", which she received when she was first admitted to the hospital.

As required by Mental Hygiene Law § 9.39, Dr. Mahon certified Ms. Boggs' need for continued hospitalization, after 48 hours. Dr. Mahon did this, since she believed, in her professional opinion, that Ms. Boggs is a danger to herself. Due to her abnormal manifestations, Dr. Mahon concluded that Ms. Boggs cannot live in the community, but needs to be institutionalized, where she can establish a trusting relationship with a psychiatrist who can encourage her to participate in therapy. It is Dr. Mahon's goal to alleviate Ms. Boggs' deterioration, so that she may be discharged and accept outpatient services. In conclusion, Dr. Mahon stressed that Ms. Boggs was not yet ready to be an outpatient.

Dr. Mahon was then cross-examined, in substance, as follows: in reaching her diagnosis, she relied in part on the patient's past history, including medical records, and her discussions with Dr. Hess, Ms. Putnam, and Dr. Gabriel, who, as mentioned *supra,* admitted Ms. Boggs to Bellevue; upon being shown the records of Metropolitan Hospital, she noted that, although on one occasion, Ms. Boggs was examined and found not to be psychotic, on April 6, 1987 two Metropolitan doctors who saw her found her to be schizophrenic; also, a third Metropolitan doctor, who saw her on an unspecified date, additionally found Ms. Boggs to be schizophrenic; in her opinion, Dr. Mahon found the medical records, upon which she based her diagnosis, to be "remarkably consistent".

Furthermore, in her cross-examination, Dr. Mahon testified that she never observed Ms. Boggs walk in front of automobiles, or defecate on herself; but, as mentioned *supra,* Ms. Boggs, herself, had told Dr. Mahon she did often urinate and defecate on herself. With respect to medication, the witness testified that she had ordered it, but Ms. Boggs refused to take it.

Following the conclusion of Dr. Mahon's cross-examination, the court questioned her. First, the court asked the witness if

her diagnosis that Ms. Boggs needed to be hospitalized was based upon the simple fact Ms. Boggs refused services. In response, Dr. Mahon denied that her diagnosis was based on anything other than the facts the witness had developed from observing Ms. Boggs' hospital behavior, which was discussed *supra,* and the mental examinations she had performed on Ms. Boggs. Then, the court asked if Ms. Boggs' mental status could change markedly in three weeks, from the time Ms. Boggs was seen at Metropolitan Hospital until she was admitted to Bellevue. Dr. Mahon answered that question, in substance, as follows:

"I think Miss Boggs shows remarkable ability, as is not uncommon with some psychiatric patients, to adapt and to regroup and organize herself temporarily in settings such [as] psychiatric emergency rooms, such as the inpatient service here at Bellevue and appear to be very rational and appear not to have any severe psychosis.

"However, as a psychiatrist what I have to do is make sure I evaluate not only what I am seeing now and on a daily basis with Miss Boggs, but look at the history, and running in front of traffic and saying she has a right to endanger her life is suicidal and as a psychiatrist, I have to call that suicidal behavior and I have to treat it as a clinician".

The third psychiatrist to testify for the respondents was Dr. Sabatini, who was Medical Director in the Department of Psychiatry at New York University Medical Center. Dr. Sabatini was qualified, as an expert, in adult psychiatry.

On direct examination, Dr. Sabatini testified, in substance, as follows: in his opinion, Ms. Boggs is dangerous to herself; his examination of her indicated signs and symptoms of "schizophrenia", and that she is delusional and acted on her delusions. For example, with respect to Ms. Boggs' practice of tearing up money, Dr. Sabatini commented in his testimony as follows: "It's not a general phenomena observed and the indications I got were that there was a meaning to the destruction of this money because it represented, when it was given to her, people saying things about her—negative things about her which had a sexual overtone, specifically a sexual overtone, and I think that the people who were most, most accused of doing the sexual acts to her were referred to by the patient as 'niggers'. I don't think that that necessarily meant that they were black. But these were the people who were, in some way, trying to control her sexuality through money. And

I think the destruction of money served to dispel that". In summary, Dr. Sabatini testified that Ms. Boggs' ripping up the currency appeared to have some private meaning to her; and, that, her response to the witness' question concerning the money, became "tangled up with black males [and] prostitution".

Moreover, Dr. Sabatini testified that Ms. Boggs told him she met her toilet needs, with an unrelated story about a woman in Connecticut and that woman's need for police help. Dr. Sabatini observed that failure to respond directly to a question, as Ms. Boggs had done concerning meeting her toilet needs, as indicative of one of the defects in the thought process one finds in schizophrenia.

Furthermore, Dr. Sabatini testified that it is not unusual for a mentally ill person not to be admitted to a hospital on one occasion, and then to be admitted on another; since he explained "mental illness is not a stable condition". The witness noted a mentally ill patient may stabilize in a hospital, and not display symptoms, since the hospital environment presents the "protection [of] the structured [setting] which allows [a mentally ill patient] not to have to resort to the psychotic defenses that are utilized outside".

In summary, on direct examination, Dr. Sabatini testified: in his opinion, some homeless people can live safely on the street, but Ms. Boggs does not fit into that category, since the witness does not believe she has the mental stability to survive in that environment; in his view, if left unattended in the street, Ms. Boggs will deteriorate; the witness denied that Ms. Boggs was hospitalized simply as a result of refusing services from Project HELP; and Ms. Boggs was brought to the emergency room to be hospitalized, since she was considered to be in an acute state, and she was admitted for involuntary treatment of a schizophrenic disorder.

The fourth psychiatrist to testify for the respondents was Dr. Marcos, who was vice-president for mental hygiene of respondent NYCHHC, and professor of psychiatry at New York University School of Medicine. It was stipulated that Dr. Marcos is an expert.

On direct examination, Dr. Marcos testified, that he reviewed Ms. Boggs' records and examined her, and, upon that basis, concluded she was a danger to herself, since she had admitted running into moving traffic, and she claimed that activity was no one else's concern; in his opinion, Ms. Boggs

does not have the capacity to live on the street; according to the witness, he elicited delusions from Ms. Boggs in connection with her burning of currency; the witness explained that, in Ms. Boggs' mind, being given currency was equated with men trying to tell Ms. Boggs that she was a prostitute; furthermore, the witness interpreted Ms. Boggs' burning of the currency as evidence of her belief that she could gain respect and dispel the idea she is a prostitute; and he found evidence of schizophrenia in Ms. Boggs' delusional, irrelevant and unconnected answer to his question about defecation and urination on the street.

On November 4, 1987, Ms. James who, as mentioned *supra,* was Ms. Boggs' older sister, came forth and volunteered to testify on behalf of respondents. In substance, Ms. James testified that Ms. Boggs' real name is Ms. Joyce Brown; the witness last heard from Ms. Boggs in August 1986, when Ms. Boggs telephoned her collect, and began to curse the witness; the cursing was obscene and without form, fashion or pattern, since it was "just a string of curse words. No conversation"; until May 1986, Ms. Boggs had lived with the witness; then one day during the month of May, Ms. Boggs began to scream at and verbally abuse Ms. James and another sister; after the May incident, Ms. Boggs was asked to leave the home; thereafter, the witness did not know where Ms. Boggs next went, but the witness believed she lived in shelters; and the witness noted that in the past, Ms. Boggs had been employed as a secretary for the Elizabeth, New Jersey, Human Rights Commission until 1985.

Another witness for the respondents on their direct case was Mr. Lerner. In substance, Mr. Lerner testified that he is a driver for a car service; he had taken a number of pictures of Ms. Boggs in the street on April 19, 1987; some of these pictures were admitted into evidence; he observed Ms. Boggs defecating on the streets on a number of occasions; the witness stated that respondents' exhibit C-3 in evidence represented a picture of Ms. Boggs defecating on the street; other photographs in evidence, respondents' exhibits C-1 and C-2, according to the witness, represented feces Ms. Boggs left behind, after defecating in the street.

Ms. Boggs, the petitioner, then presented her case, which consisted of the testimony of three psychiatrists (Drs. Ramon Patel [Dr. Patel], Robert Gould [Dr. Gould], and Michael Pawel [Dr. Pawel]) who had never observed Ms. Boggs' activities in the streets; and Ms. Boggs' own testimony.

The first witness to testify for Ms. Boggs was Dr. Patel who was director of inpatient psychiatric services and emergency services at Bronx-Lebanon Hospital, and the court qualified him as an expert in adult psychiatry.

In substance, on direct examination, Dr. Patel testified as follows: he examined patients who were being admitted, pursuant to Mental Hygiene Law § 9.39; in deciding whether a patient is dangerous to himself or herself, he looks to see if the patient has actually hurt himself or herself in the past, or has expressed any thoughts about hurting himself or herself; and, also, he would look for "impulsive activity like drug abuse or self-destructive behavior or destroying property".

Furthermore, Dr. Patel testified that he first examined Ms. Boggs on November 1, 1987; thereafter, he examined her briefly on each subsequent day, up to the time he took the witness stand on November 5, 1987; in his opinion, Ms. Boggs is not psychotic, since he found her alert, coherent and oriented to time and place; she was nicely dressed and well groomed in the hospital when he met her; he did not find any hallucinations, delusions, or thought disorder concerning Ms. Boggs; he disagreed with the diagnosis that Ms. Boggs is a paranoid schizophrenic, since in his opinion, Ms. Boggs is not dangerous to herself or others; he believed Ms. Boggs' statement that she "walks in front of heavy traffic and that its her business", was not evident of suicidal ideation, but rather an expression of self-pride; after completing his direct examination, Dr. Patel was cross-examined, as follows: he admitted that he never saw Ms. Boggs on the street; and he further admitted that many of the alleged facts, which Ms. Boggs had told him and upon which he relied in part in reaching his conclusions, were not true. For example, the witness admitted that Ms. Boggs' statements that she had a 15-year relationship with a man, which had ended five years ago when he walked out on her, was not true; nor was Ms. Boggs' statement to the doctor that she had never required psychiatric hospitalization true; also, Ms. Boggs' statement that she was raised by a foster family was not true; furthermore, Ms. Boggs' statement that she had been living on the street for five years was not true, and Dr. Patel testified that this information, like the other untrue information, would affect the assumptions he had made about Ms. Boggs' level of functioning.

Dr. Patel also admitted on cross-examination that Ms. Boggs' taking of the name (Billie Boggs) could be one indication of psychopathology; although the doctor concluded that

Ms. Boggs did not meet the criteria of schizophrenia, he did find indications that some of the criteria may be present, including social isolation and withdrawn behavior; even though he had no reason to disbelieve the statements of the respondents' psychiatrists that petitioner urinates and defecates on herself, however, he disbelieves that those statements of the respondents' witnesses that Ms. Boggs screams obscenities at passersby; he explained that, after speaking to Ms. Boggs, he found that she is not the kind of a person to do that to passersby without provocation; he admitted that his clinical judgment of Ms. Boggs would change if many of the incidents, which respondents' witnesses testified to observing, actually happened; and he acknowledged that psychiatric theory recognizes that a very ill person can go through a period of remission in a hospital.

Finally, Dr. Patel was asked these hypothetical questions by respondents' counsel, which he answered, as follows:

"QUESTION: Let's assume a hypothetical that Miss—it is true that Miss Boggs does urinate and defecate on herself; that she does assault passersby, that she has deteriorated, that she does call people f...... n.....s and s... my d..., that she believes that there is a connection between money and sex with men. If those were true, would that change your opinion, your clinical impression of Miss Boggs?

"ANSWER: Yes.

"QUESTION: It would. Why would it change that?

"ANSWER: Because it could represent some kind of personality problem because of which the person may not be able to function. So I think that if it was indeed true it would change my opinion, it can.

"QUESTION: And hypothetically, if what I described to you were true, would you believe that she would do better and in need of hospitalization, and rather than her being able to function on the street—would you like me to repeat that. Am I sure about my question, okay. Hypothetically, Doctor, if those statements were true, would you believe that patient needs care and treatment in a hospital and cannot survive on the street? Would you believe that she requires care and treatment in a hospital?

"ANSWER: Yes."

The next psychiatrist who testified for Ms. Boggs was Dr. Gould, who was a professor of psychiatry at New York Medical College, and an attending psychiatrist at Metropolitan

Hospital. Respondents stipulated that he is an expert in psychiatry.

In substance, on direct examination, Dr. Gould testified as follows: four days after Ms. Boggs was admitted to Bellevue, on November 1, 1987, he first examined Ms. Boggs and found her to be "warm and open, spoke without any pressure spontaneously, coherently, logically, without any tangential thinking"; he had never seen Ms. Boggs on the street; he found no suicidal or homicidal ideation and no delusions or hallucinations concerning Ms. Boggs; and, upon this basis he concluded that Ms. Boggs was not psychotic.

Furthermore, Dr. Gould noted that Ms. Boggs' judgment "was the only thing that was slightly impaired in a sense that she was not aware socially of the kind of troubles ensue from her behavior. [Her] insight was somewhat impaired along the same lines, but by no means nil"; in the witness' professional opinion, Ms. Boggs is not schizophrenic; he discussed with Ms. Boggs the incidents reported by other doctors, and that she explained her reasons for her actions; he indicated that Ms. Boggs has no delusions about money, rather, he explained, that when someone threw paper money at Ms. Boggs and she found it insulting or degrading, she would destroy it; with respect to her urinating and defecating on the street, the witness thought that it was not delusional because Ms. Boggs, according to him, had no alternative; he did not believe Ms. Boggs was either suicidal or dangerous to herself; when Ms. Boggs ran in front of traffic, the witness testified "there was no indication, in my questioning her about this, that she was interested in having herself killed"; he further noted "the fact that she has never been hurt and she's never hurt herself is strong indication that she has very good survival skills"; he believed Ms. Boggs' verbal abuse of others presented no danger, since he explained that Ms. Boggs simply did not wish to be disturbed by some individuals who invaded her privacy and she cursed at them to go away; he stated that Ms. Boggs was congenial to those people she liked, even though he had never observed her in the street; when asked if her verbal response to those she disliked presented a danger, the witness responded "I think that comes under the old cliché of sticks and stones may break my bones, but words can never hurt me. That is all she's ever done, being verbally abusive"; he rejected the testimony of respondents' experts that a paranoid schizophrenic could stabilize within a few days of an involuntary admission to a hospital; in fact, in his opinion, rather

than stabilized, he believed that Ms. Boggs would become more angry; he indicated that in his opinion, the small amount of medication Ms. Boggs had been given could not account for the change in her behavior following her admission to Bellevue; with respect to predictions of future dangerousness, he found them suspect, in view of the fact that to diagnose someone who is suicidal, there must be a history of severe depression and usually suicide attempts; with respect to violent behavior towards others, it would be necessary, in his opinion, to show violence in the past, "that she may have been carrying weapons or using weapons at times"; he found no evidence of deterioration in Ms. Boggs' mental or physical condition; he believed she provided for herself quite well, by eating every day from a nearby deli; and he found that her only deterioration was in the state of her clothing.

After completing his direct examination, Dr. Gould was cross-examined as follows: he admitted that he had interviewed Ms. Boggs for a total period of only about two hours over the course of the three days before the instant hearing; he had never seen Ms. Boggs on the street; as to the issue of destroying money, he testified that Ms. Boggs destroys paper money but accepts coins in view of the fact that coins are allegedly easier for her to handle; and he indicated that, in his opinion, Ms. Boggs had "worked out a fearless, independent lifestyle and survival style that worked for her. Unconventional though it may be".

The third psychiatrist to testify for Ms. Boggs was Dr. Pawel, who was attending psychiatrist at St. Luke's-Roosevelt Hospital, and an instructor in psychiatry at Columbia Presbyterian College of Physicians and Surgeons, and the court qualified him as an expert in psychiatry.

In substance, on direct examination, Dr. Pawel testified as follows: he examined Ms. Boggs on October 30, 1987 and his conclusions regarding her mental status were "very similar to what has been described by Dr. Gould"; he did not believe that Ms. Boggs posed a danger to herself or that her condition is comparable to that of other patients admitted under Mental Hygiene Law § 9.39; he frequently hospitalized patients involuntarily under Mental Hygiene Law § 9.39; Ms. Boggs is not psychotic at this time, in his opinion; he did not believe that Ms. Boggs could have been psychotic on the street, although he had not seen her there, and then pulled herself together since being admitted to the hospital; and he concluded that Ms. Boggs' behavior is no more dangerous than at least half, if

not all, the people in the courtroom, where the instant hearing was taking place.

After completing his direct examination, Dr. Pawel was cross-examined as follows: he saw Ms. Boggs on three occasions, and he examined or interviewed her for a total of only about 1 hour and 15 minutes; he admitted that he had never seen Ms. Boggs on the street; and he further admitted that he could not state whether Ms. Boggs was better or worse on the street.

At the hearing, Ms. Boggs testified in her own behalf. For the sake of continuity, Ms. Boggs' responses on direct and cross-examinations will be treated together. In substance, Ms. Boggs testified that: she used the names "Billie Boggs" and "Anne Smith" on the streets, since she did not want her identity known, in view of the fact that allegedly her sisters were looking for her; she lives next to a restaurant on Second Avenue, between 65th and 66th Streets and she stays at that location, since there is a hot air vent, although she lived on the streets during the winter of 1986, she indicated that she had never been cold; she panhandles money for food, and, in that fashion, she makes between $8 and $10 a day; she needs allegedly about $7 a day to buy her food; she admitted to urinating and defecating on the street, she denied defecating on herself or in her clothes; on her admission to Bellevue, on October 28th, she admitted telling Dr. Gabriel, mentioned *supra*, that she did defecate and urinate in her clothes; she claims she has adequate clothes, and that when she needed more she had "friends" who would supply them to her; she used profanity in order to make the staff of Project HELP go away; she claims that her umbrella serves the purpose of protecting her from the sun; she claimed that she had never run in traffic, but, on one occasion, when Project HELP tried to offer her a pair of slacks, she stepped between two parked cars and threw the slacks into the street; she destroys paper money if it is thrown at her or given to her in an allegedly offensive manner; she has no delusions about black persons giving her money for sex; and she never hurt anyone on the street or threatened anyone, and no one ever threatened her for using profanity.

Furthermore, Ms. Boggs testified that she would go back to the streets, if released; she acknowledged that she had been employed in the past and had worked for a Human Rights Commission in Elizabeth, New Jersey, during the period from 1978 to 1984; prior to her being employed by the Human

Rights Commission, she was employed by Bell Laboratories for two years; she admitted that her sister had asked her to leave the family home; she had lived in a shelter in 1985, but she denied being asked to leave that shelter on account of violent behavior; she had not informed her physicians that she had a previous psychiatric hospitalization; and, although the records of Metropolitan Hospital indicate that she was taken there only 5 times during 1987, she claimed that she had been taken to that hospital on 15 occasions during that year.

Upon the conclusion of Ms. Boggs' case, the respondents recalled Dr. Mahon to rebut the expert testimony submitted in support of Ms. Boggs' release.

During the course of Dr. Mahon's rebuttal testimony, she had occasion to give her professional opinion concerning the meaning of the psychiatric medical record of the East Orange General Hospital (East Orange), located in East Orange, New Jersey. This East Orange record, which indicated that Ms. Boggs had been admitted to that hospital's Crisis Unit on June 26, 1985, was admitted into evidence as respondents' exhibit E.

Our examination of respondents' exhibit E indicates, in pertinent part, that Ms. Boggs had been brought to the subject Crisis Unit by her sisters, who, according to the psychiatric record: "report increasingly hostile and threatening behavior —she [Ms. Boggs] has been evicted from shelters and boarding homes for aggressive and potentially assaultive behavior"; and a progress report dated June 26, 1985, at 10:45 P.M., indicates that Ms. Boggs exhibited hostile and threatening behavior, and that she had been evicted from a boarding home, due to threatening behavior; and, while at the hospital, Ms. Boggs had been medicated with 350 mg. of Thorazine, three times a day and at bedtime. In her testimony, Dr. Mahon stated, in her professional opinion, this amount of Thorazine is a very large dose, and indicative of "severe psychosis".

Furthermore, Dr. Mahon testified in pertinent part concerning the East Orange record as follows: Ms. Boggs had been placed in seclusion in the hospital; a patient is placed in seclusion in order to reduce extremely agitative and assaultive behavior; the seclusion room, according to the witness, calms the patient by reducing the stimuli around him or her; seclusion is usually ordered if a patient is assaultive, threatening or actually hitting someone; while in seclusion, the witness noted Ms. Boggs received additional Thorazine; the witness

indicated that the East Orange record stated that Ms. Boggs had been placed in four-point restraints; this type of restraint, which holds down a person's legs as well as their arms, is used when such a person is using his or her legs and arms in such a manner as to threaten others; the records indicate that Ms. Boggs had been diagnosed "atypical psychosis—rule out paranoid schizophrenia" by the psychiatrists at the New Jersey facility; the witness explained that such a diagnosis indicates that a patient has been admitted to the hospital with a psychotic disorder; according to the witness, a patient admitted to a psychiatric hospital would not be diagnosed paranoid schizophrenic, unless there is evidence that a patient suffered from the symptoms of such a disorder for at least six months; in view of the fact that East Orange did not have a case history on Ms. Boggs going back six months, a psychiatrist at that facility would make a preliminary diagnosis of atypical psychosis; the hospital record completed on Ms. Boggs' admission, describes her as follows: depressed, anxious, insomnia, poor work history and drug history; the final diagnosis of Ms. Boggs at this hospital states that she suffered from a paranoid personality disorder, which is not a psychotic disorder; although the discharge sheet says that Ms. Boggs was not threatening or dangerous, that discharge sheet had been prepared after Ms. Boggs had been in the hospital and treated for 15 days and heavily sedated; in the witness' opinion, the medication provided to Ms. Boggs at East Orange was correct for the treatment of paranoid delusions and threatening behavior; such medication was "a very traditional way of treating a psychotic, dangerous patient"; and the witness indicated that Ms. Boggs' condition at the time of her discharge from East Orange could be explained by the medication she had received during her stay there.

Following the receipt of all of the evidence, the hearing court, by order entered November 12, 1987, granted Ms. Boggs' application, and directed her release from respondent Bellevue (136 Misc 2d 1082). Thereafter, by order entered November 13, 1987, this court stayed the hearing court order pending the determination of this appeal.

Although Ms. Boggs, as mentioned *supra,* was committed involuntarily to respondent Bellevue for observation and treatment, pursuant to section 9.39 of the Mental Hygiene Law for a period of 15 days, which period expired on November 12, 1987, subdivision (b) of section 9.39 provides that, under other relevant sections of the Mental Hygiene Law, a

patient requiring continued involuntary psychiatric treatment may be retained in the hospital.

For example, section 9.27 of the Mental Hygiene Law authorizes the involuntary retention of a person, in need of hospital care for mental illness, beyond the 15 days mentioned *supra.* In pertinent part, subdivision (a) of section 9.27 reads that: "The director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person". Furthermore, subdivision (b), paragraph (6) of this section permits the director of the hospital in which the subject person is hospitalized to be an applicant for such relief. This application shall, *inter alia,* "contain a statement of the facts upon which the allegation of mental illness and need for care and treatment are based and shall be executed under penalty of perjury" (Mental Hygiene Law § 9.27 [c]). If such application is granted, the party concerned may be retained for 60 days, unless such party requests a hearing on the question of the need for his or her involuntary retention. In any event, if no hearing is requested, or if the court does not establish a specific period of retention, the hospital director must seek additional judicial approval, if he or she wishes to retain the patient beyond the 60-day period *(see,* Mental Hygiene Law §§ 9.31, 9.33).

■ Since we are advised at page 43 of the main brief of respondents NYCHHC and Bellevue that two Bellevue hospital psychiatrists have made the necessary certifications to retain Ms. Boggs under section 9.27, we find that this case is not moot.

Incidentally, the United States Court of Appeals for the Second Circuit held in *Project Release v Prevost* (722 F2d 960, 973-974 [1983]) "the New York State civil [involuntary] commitment [of persons, who are mentally ill and in need of care and treatment, due to the fact that they are a danger to themselves] scheme, considered as a whole * * * meets minimum due process standards without the addition of an overt act requirement".

■ After our review of the record before us, we find that the hearing court erred in its determination in this matter. This conclusion is based upon the fact that we find that respondents, NYCHHC and Bellevue, have met their burden of presenting "clear and convincing proof" *(Addington v Texas,*

441 US 418, *supra)* that Ms. Boggs should be involuntarily retained in a mental hospital for treatment, since she, at the present time, suffers from a mental illness, which if untreated "is likely to result in serious harm to [herself]" (Mental Hygiene Law § 9.39 [a] [1]). Our analysis is set forth *infra.*

It is well established in this State that a person may be involuntarily confined for care and treatment, where his or her mental illness manifests itself in neglect or refusal to care for themselves to such an extent that there is presented "serious harm" to their own well-being *(see, for example, Matter of Scopes,* 59 AD2d 203, 205 [3d Dept 1977]; *Matter of Carl C.,* 126 AD2d 640 [2d Dept 1987]).

We have held in *City Univ. v Finalco, Inc.* (129 AD2d 494, 495 [1st Dept 1987]), that "[f]indings of fact [of a trial court] should not be disturbed unless such findings could not have been reached under any fair interpretation of the evidence. *(Parone v Rivers,* 84 AD2d 686 [1981])". In the instant case, we must make our own findings of fact, since there is no fair interpretation of the evidence that can support the fact findings of the hearing court, and we reject these findings. The Court of Appeals, unanimously, in *Northern Westchester Professional Park Assocs. v Town of Bedford* (60 NY2d 492, 499 [1983]), held that the authority of the Appellate Division "is as broad as that of [a] trial court * * * and * * * it may render the judgment it finds warranted by the facts".

We find very significant the testimony of Dr. Hess, who is the only psychiatrist who observed Ms. Boggs in the street; the testimony of Ms. Putnam, the psychiatric social worker, who testified as to the year-long observation of Ms. Boggs by herself and other staff members of Project HELP, concerning Ms. Boggs' activities in the street; the testimony of treating psychiatrist Dr. Mahon and the record of East Orange, all of which indicate if Ms. Boggs is not retained in involuntary confinement "serious harm" will befall her. In passing, we note the responses of Dr. Patel, Ms. Boggs' own psychiatrist to the hypothetical questions propounded to him, set forth *supra.*

Dr. Hess observed Ms. Boggs in the street, during a period that extended from July to October 1987. In contrast, none of Ms. Boggs' three psychiatrists observed her outside of the hospital, which, unlike the street, is a structured, safe environment. Dr. Mahon testified that she believes that a trusting relationship is beginning to develop between her and Ms. Boggs, and given some time, "there may indeed be a relation-

ship built up which would allow this woman to choose a better style of living".

Furthermore, Dr. Mahon testified that some of Ms. Boggs' improvement, since being admitted to the hospital, might be attributable to the small dose of medication that Ms. Boggs received when she was first admitted to the hospital by Dr. Gabriel. Moreover, Dr. Mahon testified that Ms. Boggs is not now ready to be an outpatient, since she presently has no capacity to comprehend her need for food, clothing or shelter, and, in addition, Ms. Boggs cannot comprehend obvious danger. Finally, Dr. Mahon testified that if Ms. Boggs is released, she will deteriorate, and then she would be suicidal. A threat of serious harm to a mentally ill person "can result from a refusal or inability to meet [her] essential needs for food, clothing or shelter" *(Matter of Carl C., supra).*

The undisputed evidence, in the record, indicates that Ms. Boggs held responsible employment until 1984. Following that time, her mental condition began to deteriorate, causing her admission to East Orange General Hospital in 1985, and finally culminating in her involuntary commitment to Bellevue on October 28, 1987.

Numerous examples of Ms. Boggs' mental deterioration are found in this record, such as beginning in May 1987, Ms. Boggs' behavior became more provocative; Ms. Boggs began to chase the Project HELP staff and other individuals, particularly black males; she began at that time to scream racial epithets at deliverymen and others and used an umbrella to keep persons away from her; during August and September of this year, Ms. Boggs became more aggressive and less inhibited, displaying her bare buttocks and continuing to chase those who approached her; her level of self-care also deteriorated at that time, and Ms. Putnam testified that she personally observed fecal matter on the sheets in which Ms. Boggs wrapped herself; significantly, Ms. Boggs told Dr. Mahon that she often defecated and urinated on herself.

Although Ms. Boggs has never been involuntarily admitted to a city hospital, prior to her hospitalization in Bellevue in October 1987, in fact, on at least two occasions when petitioner was taken by Project HELP to Metropolitan Hospital in the spring of 1987, she was diagnosed as schizophrenic. Further, when she was brought into Bellevue Hospital on October 28, 1987, she admitted to "running in front of moving cars in heavy traffic". Dr. Mahon testified that when she saw Ms.

Billie Boggs for the first time on October 29, 1987, Ms. Boggs screamed obscenities at her and physically threatened her.

Dr. Gould, one of Ms. Boggs' expert witnesses, testified that a psychiatrist may make a prediction of future violent behavior, if there has been violent behavior in the past. We find that the evidence presented in this case clearly and convincingly demonstrates Ms. Boggs' past history of assaultive and aggressive behavior.

Dr. Patel, another of Ms. Boggs' experts, testified that in determining if someone is mentally ill, he would look for evidence of drug abuse or other such self-destructive behavior. Ms. Boggs admitted a history of drug abuse, and her admission to the emergency room doctor, Dr. Gabriel, that she walks in front of moving cars, is clearly evidence of self-destructive behavior.

We find a significant concession in the testimony of Dr. Patel, who, as mentioned *supra,* was one of Ms. Boggs' experts, wherein he admitted on cross-examination that his clinical impression of Ms. Boggs would be different, if it were true that she urinates and defecates on herself, that she used abusive and obscene language to passersby, and that she has stated there was a connection between her accepting money and sexual encounters with black men. Thus, if respondents' characterization of the petitioner's behavior on the street is accepted, it would appear that Dr. Patel would agree that Ms. Boggs required treatment and care in a hospital.

In its opinion (136 Misc 2d 1082, 1086, *supra)* the hearing court states, in substance, that the respondents' psychiatrists and the psychiatrists who testified on behalf of Ms. Boggs "are nearly diametrically opposed in their assessment of [Ms. Boggs'] mental condition and in their predictions as to whether she is likely to cause herself or others harm. Thus I [the hearing court] derive little psychiatric guidance from them and therefore place great weight on the demeanor, behavior and testimony of [Ms. Boggs] herself".

We find that the hearing court erred in placing "great weight on the demeanor, behavior and testimony" of Ms. Boggs, since the hearing court does not claim that the demeanor and behavior of Ms. Boggs, when she appeared before it, remotely resembled the demeanor and behavior she exhibited when she lived on the streets, and was involuntarily committed to Bellevue on October 28, 1987.

It is hardly surprising that the hearing court stated *(supra,*

136 Misc 2d, at 1087) "Throughout her testimony [Ms. Boggs] was rational, logical, coherent. Her use of English, both in syntax and vocabulary, is very good and bespeaks an educated, intelligent person. She displayed a sense of humor, pride, a fierce independence of spirit, quick mental reflexes", in view of the fact that, when Ms. Boggs was in the courtroom, she had recently been bathed, was dressed in clean clothes, and had just received approximately a week of hospital treatment. Dr. Patel, one of Ms. Boggs' own experts, acknowledged in his testimony that psychiatric theory recognizes that a mentally ill person can go through a period of remission in the hospital.

In view of the evidence found in the record, which indicates that Ms. Boggs has a propensity to lie, there is no reason to believe that this mentally ill woman did not lie to the hearing court. Dr. Patel, who, as mentioned *supra,* was one of Ms. Boggs' experts, testified that Ms. Boggs "lied to me [Dr. Patel]".

Moreover, Ms. Boggs pursued a pattern of lying to both the respondents' psychiatrists as well as her own psychiatrists about her prior history before she began living in the streets. In this connection, Ms. Boggs misled these psychiatrists, by telling them that for 15 years she had been involved in a relationship with a man, and that when that relationship ended 5 years ago, Ms. Boggs began living in the streets. However, that history is not true. In 1984, she was working as a secretary in New Jersey, and, in 1985, she was living with her sister in a home in New Jersey; and Ms. James testified that in 1985 Ms. Boggs worked as a secretary in New Jersey, and it was not until the spring of 1986 that Ms. Boggs left Ms. James' home.

We reject, as against the weight of the evidence, the hearing court's conclusion that, in substance, Ms. Boggs' homelessness is not a result of serious mental illness, but, rather, is the result of New York's lack of housing for the poor.

The hearing court, and our opposing brothers on this Bench, have recognized the horrible situation of the homeless in this city. This expression of compassion is not limited to them. It is shared by all, and, although we deplore, with our fellow New Yorkers, the tragedy of the homeless in this city, their plight is not the issue in this case. The sole issue before us is whether Ms. Boggs is so severely mentally ill that, unless she continues to receive hospital treatment, she is in danger of doing serious harm to herself.

In summary, less than two years ago, Ms. Boggs was a productive member of society, who had a continuous work history of almost a decade, in which she had been employed in responsible positions by Bell Laboratories, and a Human Rights Commission in Elizabeth, New Jersey; at that time, besides a job, she had a home and a family; however, in 1985 she suffered a "severe psychosis", which resulted in her admission to East Orange, where, *inter alia,* she was placed in four-point restraints, and treated with large doses of Thorazine; thereafter, we find the clear and convincing evidence indicates that, while living in the streets for the past year, Ms. Boggs' mental condition has deteriorated to the point where she was in danger of doing serious harm to herself when, on October 28, 1987, she was involuntarily admitted to respondent Bellevue for treatment; and, based upon the entire record and not selective portions thereof, we further find that clear and convincing evidence supports the continued involuntary confinement of Ms. Boggs to the hospital for treatment.

Accordingly, order, Supreme Court, New York County (Robert D. Lippmann, J.), entered November 12, 1987, which granted the petition of Ms. Billie Boggs, and directed her release from respondent Bellevue Hospital by 6:00 P.M. on November 12, 1987, is reversed, on the law and on the facts, petition is denied and the proceeding is dismissed, without costs.

MILONAS, J. (dissenting). The issue before this court can be summarized as follows: Have respondents-appellants the New York City Health and Hospitals Corporation and Bellevue Hospital (respondents) established by clear and convincing evidence that petitioner-respondent Joyce Brown, also known as Billie Boggs (petitioner), has a mental illness for which immediate observation, care and treatment in a hospital is appropriate *and* which presents a real and present threat that it will result in a substantial harm to herself or others? In our opinion, respondents have failed to demonstrate the second of these criteria.

This case has attracted considerable attention, since petitioner's involuntary hospitalization represents the first known effort by the city to implement a highly publicized and controversial Mayoral policy directed at dealing with the proliferating population of the mentally disturbed homeless. It may be perceived as a classic confrontation between the rights of a citizen against a governmental authority trying to confront

and remedy a pervasive societal problem. Petitioner, through her attorney, has waived her right to confidentiality and consented to have the press attend the hearing. Consequently, there have been almost daily news reports concerning the matter, and it appears to have prompted a number of television and other media discussions relating to the problem of the homeless. Regrettably, there is a danger that the media barrage may obscure the fact that we are not deciding the wisdom and propriety of the Mayor's program and that our ruling will not have a significant impact upon the very real social problem with which that program is attempting to grapple. All that we are authorized to do here, and indeed can do, is to determine whether respondents may lawfully retain for further hospital observation and treatment one particular individual, and, in that respect, our deliberations must be guided exclusively by the statutory and legal mandates as applied to the facts of the instant proceeding.

Joyce Brown is a 40-year-old black woman who lives on the streets, specifically on a sidewalk area located at Second Avenue between 65th and 66th Streets next to Swensens Restaurant where there is an air vent that emits hot air 24 hours a day. Beginning in December of 1986, apparently based upon communications regarding the presence in the neighborhood of a dirty, disheveled, inadequately clothed woman, members of an outreach group, the Homeless Emergency Liaison Project, known as Project HELP, placed Brown under regular observation, endeavoring to make contact with her and offering unsuccessfully to extend assistance. On a minimum of five occasions, at the behest of Project HELP, she was brought to Metropolitan Hospital, whose physicians invariably declined to admit her. Finally, on October 28, 1987, Brown was forcibly removed from the street and transported to Bellevue Hospital, in whose psychiatric unit she was confined against her will pursuant to section 9.39 of the Mental Hygiene Law. She thereafter petitioned for her release and, following a hearing which included the testimony of 11 witnesses and the introduction of numerous documents, the court found that Joyce Brown does not suffer from a mental illness that is likely to cause serious harm to herself or to others (136 Misc 2d 1082). Respondents have appealed to this court, and petitioner's release was stayed pending determination of the matter by our court.

The United States Supreme Court has recognized that involuntary civil commitment is a *"massive curtailment of liberty"*

*(Humphrey v Cady,* 405 US 504, 509 [emphasis added]). In *O'Connor v Donaldson* (422 US 563), the court considered the question of whether a State may properly confine the mentally ill merely to guarantee them a living standard superior to what they enjoy in the private community. According to the court, "the mere presence of mental illness does not disqualify a person from preferring his home to the comforts of an institution. Moreover, while the State may arguably confine a person to save him from harm, incarceration is rarely if ever a necessary condition for raising the living standards of those capable of surviving safely in freedom, on their own or with the help of family or friends" *(supra,* at 575). Thus, the court concluded, "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends" *(supra,* at 576).

Subsequently, the Supreme Court was confronted with the issue of the standard of proof necessary to confine a person against his will *(Addington v Texas,* 441 US 418). Although the court rejected the beyond-a-reasonable-doubt standard applicable to a criminal case, it stated that "the individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence" *(supra,* at 427). The Supreme Court, therefore, held the appropriate standard of proof to be by clear and convincing evidence.

Mental Hygiene Law § 9.39, which relates to the emergency admission of a person for observation, care and treatment, provides that the director of an appropriate hospital "may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness * * * and which is likely to result in serious harm to himself or others." The term "likelihood to result in serious harm" is defined by the statute as:

"1. substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or

"2. a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." (Mental Hygiene Law § 9.39 [a] [1], [2].)

Section 9.39 also contains, among other protections made available for the involuntarily retained individual, provisions for such a patient's receiving notice of his status and rights and for a prompt hearing. However, the 15-day period specified in section 9.39 has already expired, and respondents have indicated that should they prevail on this appeal, they intend to continue to confine petitioner under section 9.27 of the Mental Hygiene Law. Pursuant to this provision, a director of a hospital may retain for another 60 days "any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person." Two examining physicians have certified that Brown should be held under section 9.27, and the director of Bellevue Hospital has supplied an application for her admission. A right to a hearing is also accorded anyone confined pursuant to section 9.27, and, under certain circumstances, the patient may be held for an additional amount of time (Mental Hygiene Law §§ 9.31, 9.33; *see also, Woe v Cuomo,* 729 F2d 96, *cert denied* 469 US 936; *Project Release v Prevost,* 722 F2d 961 [both of these cases rejected constitutional challenges to New York State's civil commitment statutory scheme]). Clearly, the finding of this court regarding the propriety of petitioner's confinement under section 9.39 will have relevance to the right of respondents to continue to retain her under section 9.27, and, thus, the instant controversy is not moot despite the expiration of the initial 15-day period of detention.

The standard for an involuntary civil commitment appears to be the same under both sections 9.27 and 9.39, and such confinement "must be based upon a finding that the person to be committed poses a real and present threat of substantial harm to himself or others" *(Matter of Scopes,* 59 AD2d 203, 205). The Second Department has stated that such a threat can arise from a refusal or inability to meet essential needs for food, clothing or shelter *(Matter of Carl C.,* 126 AD2d 640; *Matter of Harry M.,* 96 AD2d 201), although this is generally intended to pertain to a person who is simply too mentally ill to take care of himself in any meaningful sense. Accordingly, the State must demonstrate by clear and convincing evidence that the person sought to be retained is mentally ill and that there is a *real* and *present* threat that he or she will cause *substantial* harm to himself or to others. In that connection, the danger must be both *real* and *immediate,* not speculative and remote.

Respondents urge that Brown suffers from a mental illness which, if left untreated, places her well-being at substantial risk. While they characterize her as engaging in escalating aggressive and violent behavior, they do not really argue that she is a danger to anyone but herself. Indeed, respondents' counsel summed up before the hearing court by asserting:

"The key issue in this case is dangerousness and the record shows three aspects of self danger. It is important to understand that our case is primarily but not exclusively about self danger. The three aspects of self danger, which any one alone would be enough to meet the statutory standard, include self danger from self neglect, from actively suicidal conduct, and self danger from aggressive behavior that is likely to provoke an attack from others.

"We have shown self danger and self neglect through the testimony of Dr. Hess, who talked about the lightweight form clothing with the torso exposed, personal hygiene of stains and smells of feces and urine, matted hair and dirty skin. Miss Putnam, the social worker, who had observed her many times, thirty to forty, testified that she was barefoot in the winter, she was barefoot in the rain. Again, that she urinated and deficated [sic] on the street, and that going to the issue the less restrictive means of caring for the patient, she had turned down all offers of food, clothing, shelter and medical assistance. While it is true that Miss Boggs did say in court today that she now would be willing to accept some services on certain times, we have found also that on many occasions she has not told the truth * * *

"On the second part of self danger, self danger from actively suicidal conduct, the patient told Dr. Gabriel that she ran into traffic and said, 'I have a right to do it. It is my business; not your business.'

"And a third level of self danger from aggressive behavior that is likely to provoke an attack on herself, Dr. Hess testified that the patient was verbally aggressive to a person who approached her with an association with Project HELP. That by late July she was exposing herself by lifting herself and was very angry and hostile, and that she ran after and threw food at Dr. Hess. While Mr. Levy has made light of that, our concern is the harm to Miss Boggs, not the harm from her. It is reasonable to believe in the City of New York that not all people will run when you throw something at them. They may turn and attack you, as well.

"Ms. Putnam testified to very provocative language used by the patient, including 'Niggers, fucking Niggers, and suck my big black cock,' words in the City of New York that may bring about assault on oneself."

Respondents expressly deny that it is their position that all homeless persons are mentally disturbed or warrant involuntary care and treatment, and they concede the right of mentally healthy people to live without shelter on the streets. Rather, respondents assert that petitioner is mentally ill, and her mental disability renders her unable to care for herself and puts her in danger of provoking an assault from others or being struck by a car. While neither of the latter events have taken place, respondents contend that they are not obliged to wait for such occurrences before intervening to assist her. However, one must again bear in mind that the law requires that respondents prove by clear and convincing evidence that there is a real and immediate threat of substantial harm to petitioner or others.

Notwithstanding the testimony of her psychiatrists to the contrary, the evidence of petitioner's mental illness is clear and convincing, only its definition and degree is uncertain. She is a withdrawn, socially isolated individual with a long history of hostile, verbally abusive behavior, which frequently manifests itself in her cursing at people, uttering obscenities and racial epithets at them and exposing her buttocks. Her abusive and hostile manner has primarily been directed at family members, Project HELP personnel, doctors and nurses at Bellevue Hospital and at East Orange General Hospital in New Jersey where she admitted herself voluntarily and was confined for several weeks in June and July of 1985. Brown has also been observed to display a variety of bizarre conduct, including burning and tearing up money in what seems to be a ritualistic fashion and what is perceived by respondents' psychiatrists to involve delusionary thinking, once shouting obscenities at black deliverymen last spring (she purportedly harbors strong negative feelings toward black males), and throwing food back at HELP members who had given her lunch. In fact, Brown has exhibited an especially hostile attitude to people from HELP and has refused all of their many offers of food, clothing and other assistance. HELP alleges that in two separate incidents, she chased their personnel down the street and once, in an episode which respondents seem to deem extremely significant and indicative of the danger in which she places herself, she ran out into the street

to toss away some clothing handed to her by HELP members. It is evident that Brown dislikes and distrusts HELP members, objects to the attention which she has received from them, and most of her abusive, aggressive conduct on the street has had HELP people as its target. In that regard, it can be surmised that she resents the persistent offers of unwanted assistance, and her anger at the group derives in no small part from the fact that HELP is responsible for her having been forcibly removed on a number of occasions from the streets to Metropolitan Hospital.

Brown's personal hygiene is minimal if not virtually nonexistent. She rarely bathes, her clothing is generally dirty and tattered, and she urinates and defecates in the street, claiming that the public toilets are too distant for her to utilize. Although she denies that she soils herself, she did inform Dr. Gabriel, the emergency room physician who admitted her to Bellevue Hospital, that she urinates and defecates in her clothes and may have told the same thing to Dr. Maeve Mahon. However, the record is devoid of evidence that any feces were ever discovered on her garments during the many times that she was removed either to Metropolitan Hospital or Bellevue Hospital, where she was always cleaned up, and there is no indication that anyone ever saw Brown soil herself. Her body odor, of course, was extremely pungent while she was on the street, and once a coat which was wrapped around her was observed to be stained with feces. Since Brown covers herself with this coat when she defecates, as seen in a photograph admitted as an exhibit, it is suggested that this soiling occurred during that process.

Respondents have pointed to a few other events as symptoms of Brown's mental illness, which their psychiatrists generally described as deteriorating and of a paranoid schizophrenic variety. One of respondents' physicians stated that she engaged in a singsong speech pattern called "clanging". Dr. Mahon characterized her speech as "pressurized", which does not permit the listener to interject questions or comments. Dr. Mahon considered it a delusion that Brown believed herself to have been falsely committed to the hospital and feared she would die in the hospital, and Dr. Mahon also made reference to a claim by Brown of having seen another female patient standing by her bed at night when there actually was only one other patient (a female) on her section at that time. On the latter occasion, petitioner purportedly spoke to herself. All of respondents' psychiatrists deemed her

act of tearing and burning paper currency, the money at times allegedly placed in neat piles in urine, to represent delusional thinking. Respondents, moreover, assert that Brown's ability to function is impaired. Yet, notwithstanding the opinion by respondents' psychiatrists that she is suffering from a psychosis, rather than a severe personality disorder, the proof of this is dubious. Not only do petitioner's physicians dispute the claim that she is psychotic, but even respondents' psychiatrists admit that she does not hallucinate and is basically not delusional. Brown's speech is lucid and coherent; she is intelligent and, as her testimony at the hearing reveals, she even possesses a sense of humor. According to hospital records, she has a good grasp of current events (she was aware of the Summit conference and the death of Bronx District Attorney Mario Merloa), and a number of these records contain a diagnosis of a personality disorder rather than a psychosis. There is strong evidence that neither the small single dose of medication which was administered to her upon her admission to Bellevue Hospital nor her brief hospital confinement would result in the "recompensation" of a chronic paranoid schizophrenic.

At any rate, regardless of whether or not Brown is psychotic, she is clearly mentally ill. The evidence, however, of whether her mental illness is of such a nature and magnitude as to render her dangerous to herself or others is highly questionable, much less clear and convincing. For instance, there is no proof whatever that she has ever harmed herself or anyone else. While Jane Putnam, Project HELP's director and a certified social worker, commented at the hearing that she noticed Brown chase certain people, including passersby, the only specific incident of Brown ever cursing at, or doing anything else to, passersby took place more than six months ago and involved some black deliverymen, who were across the street at the time. It is not certain whether these men did anything to provoke her reaction, and it is the only time that she is known to have been abusive toward anyone in the street other than Project HELP personnel. As for the HELP people, it is apparent that Brown simply wanted them to leave her alone. Moreover, although she may have twice chased away HELP members, and once threw a sandwich and some other food at a HELP psychiatrist, there is no proof that she has ever assaulted or in any other way injured anyone. The HELP observations of Brown as noted by their field workers indicates: "she behaved nicely towards passersby who offered

her some change but was very hostile toward worker—ignored questions asked * * * gentleman sitting down next to her in conversation [she] recognized team * * * got up and walked away * * * when we asked if we could do anything for her, [she] replied 'you can leave me alone, that is what you can do' * * * sent patient to hospital involuntarily, 3/28/87; talking in her usual spot on 65th Street and 2nd Avenue with a male friend who was with her yesterday * * * [when team approached she became] loud, cursing, agitated, would not tell us what happened at hospital * * * engaged in polite, friendly conversation with passersby, asking young neighborhood woman what the woman will have for dinner. *Not recognizing us as members of the team she is quite appropriate and friendly.* Markedly, different from her hostile, [illegible] presentation." (Emphasis part of record.)

Indeed, respondents do not seriously contend that Brown is likely to cause physical harm to other persons and have made absolutely no record to that effect. It is, instead, the danger which she allegedly poses to herself which forms the basis for their attempt to confine her. In that context, Brown has resided on the streets for approximately one year. She feeds herself through money collected from panhandling and purchases the same meal every day from a neighborhood delicatessen. This meal consists of a chicken cutlet, juice, milk and occasionally ice cream. According to respondents' own psychiatrists, she is not malnourished and has no serious physical problems. In response to respondents' allegation that she ritualistically rejects paper money, petitioner testified that she destroys bills when they are forced upon her or offered to her in a demeaning way. She further explained, in a realistic assessment of city life, that she prefers not to keep money overnight, since it is dangerous to sleep in the street when in possession of money.

It is asserted, as well, that she is inadequately dressed in the winter, without a coat and often without shoes or socks. Brown, however, keeps warm by lying next to an air vent that releases a constant stream of hot air 24 hours a day. At the hearing, Brown stated that she had not suffered from a cold once in the past year, and the only time that she was in danger of being frost-bitten occurred after she was forcibly transported to Metropolitan Hospital and then released in freezing temperature, compelling her, while wearing flimsy footwear, to walk a considerable distance back to her air vent. Certainly, respondents did not produce any proof that Brown

was ever observed to be physically ill while on the streets. Indeed, her most recent work-up at Bellevue Hospital upon her admission there and the emergency room records of her many involuntary Metropolitan Hospital examinations show no signs of any physical disorders.

Further, the homeless are generally unkempt, dirty, poorly clad, and often reek of urine and feces, yet respondents expressly deny that the mere condition of being homeless and malodorous makes a person dangerous to himself. While it may be argued that living on the streets exposes a person to constant peril, respondents are not contending that all homeless persons should be removed from the streets because they are thereby a danger to themselves. As for the claim that Brown urinates and defecates on herself, even if this is true (which was by no means clearly established), respondents have not introduced any evidence that soiling oneself poses a physical hazard. It may be unsanitary and terribly unpleasant to those around her, but no proof was offered to show that it is dangerous. Similarly, the testimony that Brown was once observed to run between cars and/or into the street was sharply disputed by her, and in any event does not mean that she has a pattern of placing herself in front of moving traffic. Her later admission to Dr. Gabriel can be viewed as an act of bravado as can her statement that she soiled herself. In fact, all of respondents' psychiatrists specifically deny that Brown has suicidal ideation. She has certainly never physically harmed herself, and respondents do not really advance the proposition that she is apt to do is in the future. The record does not show a single instance in which petitioner has ever hurt herself.

While the majority appear persuaded by Brown's purported statement to Dr. Gabriel that she walks in front of moving cars as clear and convincing evidence of her self-destructive behavior, there is no objective indication that she has ever performed any act more perilous than her once walking between parked cars to dispose of unwanted clothing given to her by HELP. The majority are thus relegated to relying upon her own questionable admission notwithstanding that they are highly skeptical of her credibility in all other respects. Furthermore, the hospital record does not cite petitioner as admitting to running into traffic, but as asserting, apparently in a defiant manner, "If I get hurt that's my business and nobody else's business." Indeed, the fact that Brown's purported self-destructiveness is not supported by the record can

easily be ascertained from respondents' decision not to rest their case upon this argument.

In the end, respondents' effort to institutionalize petitioner can be narrowed down to one claim: she is dangerous to herself because, as a result of her abusive and obscene speech and generally obnoxious behavior, she is likely to provoke others to do injury to her. Respondents contend that Brown has been living on the streets for some time, cursing and shouting and engaging in various bizarre behavior. Yet no one has assaulted her. Respondents, however, are concerned that perhaps someone might do so in the future, and, for her own protection, as well as to save some unbalanced person who might take offense at her conduct from yielding to his or her worst impulses, now propose to confine her to a hospital against her will.

While the desire of respondents to confine Brown for her own safety may at first seem well intentioned, this extreme remedy is inadequately supported by the evidence and, upon closer examination, is somewhat offensive. It should be noted that the majority do not pursue what respondents have chosen to make their strongest point. They fail to do so no doubt because respondents have demonstrated only one specific incident where Brown was abusive to ordinary citizens. That incident involved the deliverymen, and what precipitated this event is unknown. Other than a vague and undocumented allegation by Project HELP that she was abusive to others, there is no proof that her hostility and abusiveness was directed to anyone other than hospital and HELP personnel, and there is certainly no indication that she has ever provoked an assault from anyone.

It is axiomatic that a trial court's "[f]indings of fact should not be disturbed unless such findings could not have been reached under any fair interpretation of the evidence" *(City Univ. v Finalco, Inc.,* 129 AD2d 494, 495). As this court has stated in *829 Seventh Ave. Co. v Reider* (111 AD2d 670, 672, *revd on other grounds* 67 NY2d 930): "As to assessment of *witness credibility, it is a basic principle of appellate review that the findings of the nisi prius court, which alone has had the opportunity to hear and observe the witnesses and their demeanor on the stand, are to be accorded the greatest respect and are not to be disturbed, even if there is some evidence leading to a contrary result, so long as they have sufficient support in the record and are not contrary to the law."*

We cannot accept the majority's total disregard for the fact finding of the hearing court. The court carefully and patiently heard evidence offered by both sides over a span of several days comprising approximately 600 pages of testimony. Expert witnesses were offered on both sides, and extensive hospital records were admitted into evidence. What is clear is that the court gave the parties a full opportunity to develop a complete record. The court's decision reflects a full and fair analysis and careful weighing of all the testimony. Confronted with conflicting medical testimony, the hearing court placed "great weight on the demeanor, behavior and testimony of Joyce Brown herself." (136 Misc 2d 1082, 1086, *supra.*)

The majority, having dismissed out of hand Brown's credibility, give no deference to the hearing court's assessment of her testimony and condition. Yet, if the court's judgment of her mental condition is to be completely ignored, then what was the purpose of the hearing in the first place? Respondents could simply have committed petitioner based upon their own psychiatric determination and would have been entitled to retain her for as long as they considered appropriate. However, the Legislature has decreed, and indeed the Constitution insists, that an individual whose involuntary commitment is sought must be accorded due process protection. In that regard, a hearing must be provided if so desired by the detained person, at the conclusion of which it is the Judge's obligation to make an independent finding of both mental health and dangerousness based not only upon the testimony of the psychiatrist but upon the Judge's own evaluation of the demeanor and testimony of the person involved. In addition, such a hearing affords the hearing Judge the opportunity to evaluate the psychiatric testimony by comparing his assessment of the petitioner against that of the experts. Significantly, it provides the person with a hearing before an impartial Judge as fail-safe protection against improper confinement, whether the commitment is sought by a governmental authority or by relatives.

It should be stated that the majority find Dr. Patel's response to a hypothetical question posed to him by respondents to be a "significant concession". While it is true that the hypothetical is correctly quoted in its entirety in the body of their opinion, in later analyzing the importance of Dr. Patel's answer, they neglect to make mention of its complete content, most conspicuously with respect to whether Brown assaults passersby. Certainly, if the petitioner were to assault pass-

ersby, then her conduct would constitute a danger to others. There is, however, not a single instance in the record of petitioner assaulting anyone nor was most of the other conduct alleged in the hypothetical established by the record.

Petitioner's conduct on the street is understandable if we appreciate her obvious pride in her independence and in her ability to survive on her own. She derives a unique sense of success and accomplishment in her street life. In petitioner's words, when poignantly describing her ability to endure on the streets, she has called herself a "professional". Now in the face of petitioner's assessment of herself, and in her own view, Project HELP has been endeavoring to compel her to accept assistance and be dependent. Moreover, on at least five occasions, Project HELP forced her, while handcuffed, to be transported to Metropolitan Hospital, where various physicians always refused to admit her since she was deemed to be not dangerous. In fact, she was taken to Metropolitan Hospital under restraint shortly after both incidents considered significant by respondents—her running into the street and her shouting at the deliverymen. Both times she was observed by different doctors while she was at her worst and still determined not to be dangerous to herself or others. Petitioner's explanation for her street conduct is that she has learned that by employing her "profanity" and assorted bag of obnoxious tricks, she was always able to induce Project HELP to retreat.

However, even assuming that Brown is abusive, obnoxious and obscene to everyone, it would still be inappropriate to confine her. There is not one incident in the record of any violence directed at the petitioner or any emanating from her. It appears that she has been the beneficiary of people's normal responses to hostile and distressing experiences, which is to retreat and distance themselves as much as possible from the unpleasantness, rather than to close in or attack. In a free and democratic society, an individual has the right, within certain permissible limits, to be verbally offensive if he or she so chooses. Therefore, there are a variety of statutes which specifically prohibit and penalize some of the offensive conduct in which petitioner has allegedly engaged. Yet, viewing her behavior as the product of an illness rather than criminality, the city has understandably declined to prosecute her criminally.

Respondents concede that normal people have the right to live on the streets so long as they can survive there. Petitioner has clearly established that she has survived. We do

not believe that a mentally disturbed person can be institutionalized merely for foul and offensive language and behavior, and certainly not without a demonstration by clear and convincing evidence that there is a real and present threat that that individual poses a substantial risk of harm to either herself or others. That is the legal standard, and it is a stringent one. Certainly a claim that there is the possibility of future assault is too speculative and remote, and it is not sufficient ground upon which to deprive someone of her liberty. One cannot accept the proposition that it is justifiable to commit involuntarily a mentally disturbed person because another mentally disturbed person may assault her.

Brown is a veteran street person who knows very well how to take care of herself. She was wise enough to select a location for her home which has a hot air vent. She feeds herself well, has developed friendships with people from the neighborhood and appears to be no better or worse dressed than other homeless persons, and she is probably healthier than most. Moreover, whatever the severity of her mental illness, she is rational, coherent, verbal, somewhat humorous and totally aware of her surroundings. She is in no more danger than anyone else who finds him or herself with no alternative but to live on the streets.

Finally, it is extremely significant that in all of petitioner's prior hospital evaluations (at least six), whether in New York or New Jersey, where she was examined by many different disinterested psychiatrists, they all concurred in one final diagnosis that she is not a danger to herself or others.

It is a tragedy that in our wealthy society so many people have been driven to homelessness, and those of us who are more fortunate must helplessly witness and feel their misery on a daily basis. Regrettably, our affluent, sophisticated and medically advanced society has not developed a more rational, effective and humane way of dealing with the mentally disturbed homeless than in a manner other than what appears to be revolving door mental health—that is, forcibly institutionalize, forcibly medicate, stabilize, discharge back into the same environment, and then repeat the cycle. These ill and unfortunate citizens especially deserve our sympathy since they are not only homeless, but hopeless. Yet, they have shown extraordinary courage, strength and resourcefulness in their ability to survive in conditions where the "normal" person would be unable to endure.

Fortunately, people of good will have become aroused, and we may be approaching the time when the problem of the homeless will be confronted with sincere and realistic attitudes and resources.

Committing Billie Boggs is not the answer.

Accordingly, the order of the Supreme Court, New York County (Robert D. Lippmann, J.), entered on November 12, 1987, which granted the petition and directed petitioner's release from respondent Bellevue Hospital, should be affirmed.

MURPHY, P. J., and SULLIVAN, J., concur with ROSS, J.; MILONAS and ROSENBERGER, JJ., dissent in an opinion by MILONAS, J.

Order, Supreme Court, New York County, entered on November 12, 1987, reversed, on the law and the facts, the petition denied and the proceeding dismissed, without costs and without disbursements.